**Arthur CURRY, Appellant–
Defendant Below,**

v.

**STATE of Indiana, Appellee–
Plaintiff Below.**

No. 53A01–9312–PC–387.

Court of Appeals of Indiana,
First District.

Dec. 8, 1994.

Rehearing Denied Feb. 23, 1995.

Transfer Denied May 3, 1995.

Arthur Curry, pro se.

Pamela Carter, Atty. Gen., Suzanne Weber Lupton, Deputy Atty. Gen., Indianapolis, for appellee.

## OPINION

ROBERTSON, Judge.

Arthur Curry appeals the denial of his petition for post-conviction relief. We affirm the ruling on the petition for post-conviction relief but remand with instructions that the confinement conviction be vacated.

On the early afternoon of March 15, 1989, Curry approached Gayle Cook as she was standing at the street folding blankets stored in the trunk of her car and abducted her by force. Curry pushed Cook onto the floor on the front passenger's side of a blue Toyota Corolla he had stolen, bound, gagged and blindfolded her with strips of duct tape, and transported her to a van he had parked nearby.

Before Curry moved Cook to the van, Cook tried to buy her freedom by offering to obtain gold for Curry from the bank. Cook learned from her conversations with Curry that Curry intended to contact her husband with demands for a ransom. The Cooks own their own business and had been identified by a national magazine as being among the wealthiest people in the nation. Cook encouraged Curry to contact her husband because she wanted law enforcement authorities to begin looking for her as quickly as possible.

Despite her efforts, Cook remained bound to a captain's chair in Curry's van for a period of approximately twenty-six hours. Curry moved the van from place to place and left it frequently. At some point, Curry acquiesced in Cook's requests for an opportunity to relieve herself and bought Cook a diaper.

As part of his carefully orchestrated plan, Curry contacted William Cook to arrange delivery of the money and gold. William Cook insisted on talking to his wife. Curry moved the van to a phone with a cord long enough to reach into the van and moved Cook down on the floor with her head in the opening between the front passenger seat and the door, so that she could speak into the phone. The Federal Bureau of Investigation agents identified the van during the phone conversation and followed it to the west side of town. There, in the parking lot of a shopping center, the agents stopped the van, arrested Curry and freed Cook.

Curry was convicted of kidnapping for ransom, a class A felony; criminal confinement, a class D felony; assault, a class B misdemeanor; and auto theft, a class D felony. He received an aggregate sentence of thirty-

two years and ninety days, the sentence on the criminal confinement conviction to be served concurrently with the sentence on the kidnapping conviction. Although the court appointed counsel to pursue a direct appeal for Curry, at his own request, Curry brings this appeal of his post-conviction petition pro se. Most of Curry's allegations of error concern claims of ineffective assistance of counsel. However, he also maintains that his decision not to testify was coerced by threats from his attorneys that the attorneys would withdraw and that the post-conviction court committed reversible error in denying his request for the appointment of counsel once his post-conviction petition had been denied.

In a post-conviction proceeding, the post-conviction court is the sole judge of the weight of the evidence and the credibility of the witnesses. *Murphy v. State* (1985), Ind., 477 N.E.2d 266, 268. When reviewing the denial of post-conviction relief, we will reverse only when the evidence is without conflict and leads solely to a result different from that reached by the trial court. *Id.*

### I.

The benchmark for judging any claim of ineffectiveness must be whether counsel's performance so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674. Claims of ineffective assistance of counsel are judged under a standard which asks whether a defendant received "reasonably effective assistance." Judicial scrutiny of counsel's performance is highly deferential and should not be exercised through the distortions of hindsight. We do not second-guess counsel's choice of strategy. Where it appears that counsel exercised professional judgment, we will not find grounds for reversal. This is true even though a petitioner may disagree with a particular choice and even though, in retrospect, one might speculate as to the wisdom of that choice over a different one. *Seaton v. State* (1985), Ind., 478 N.E.2d 51, 54.

The petitioner must show that his counsel has failed to meet the proper standard for attorney performance which is that of reasonably effective assistance. *Id.* Counsel is presumed competent, and appellant must present strong and convincing evidence to rebut the presumption. *Burr v. State* (1986), Ind., 492 N.E.2d 306, 308 (citing *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674). The performance inquiry asks whether counsel's assistance was reasonable considering all the circumstances. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

Analysis of an ineffective assistance of counsel claim also involves a prejudice component: even if a defendant shows that particular errors of counsel were unreasonable, if the error had no adverse effect upon the defense, it does not warrant reversal. *Id.* at 694, 104 S.Ct. at 2068. The court making the prejudice inquiry must ask if the petitioner has met the burden of showing that the decision reached would reasonably likely have been different absent the error. *Id.* at 697, 104 S.Ct. at 2069–70. In making this determination, a court must consider the totality of the evidence before the fact-finder. *Id.* at 696, 104 S.Ct. at 2069.

Curry's first allegation of ineffective assistance concerns counsel's decision to argue to the jury the inference, from the lack of evidence including the absence of physical evidence, that Cook had never worn an adult diaper. Curry maintains that he had informed both of his attorneys on several occasions that Cook had insisted that he purchase adult diapers for her, that he had in fact done so, that the diapers were of the step-in variety and that therefore Cook had to be lying when she testified that her feet had been continuously bound during the kidnapping. Curry insists that, in arguing to the jury that there never had been a diaper, his attorney based his entire defense upon a deliberate lie, a strategy which violated the Professional Rules of Conduct and was suicidal in light of the other evidence.

Attorney Saint testified at the hearing on Curry's post-conviction petition that over the course of the months leading up to trial Curry gave various accounts of what had

transpired to his attorneys, both orally and in writing. Curry's accounts ranged from knowing Cook intimately and having conspired with her to a complete admission that was fairly consistent with law enforcement reports and Cook's own accounts. According to Saint, as the trial approached, Curry settled upon a version of the events in which he admitted that he knew Cook, that he had worked his way into her home after he had been rebuffed by William Cook's attorney, that he had found Cook to be a very lonely person and had worked upon that to gain her cooperation. On the day of the kidnapping, she could not go through with their plan. He then forcibly pushed her into the car against her will. However, during the period Cook was with Curry, she was never really bound or held prisoner. Hence, defense counsel premised Curry's defense upon one of Curry's own versions of the events: that Cook had not been held hostage, and there had not in fact been any diaper.

Attorney Saint testified that he and his co-counsel talked with Curry about the diaper. After having received discovery from the State, Saint began to feel that Curry's best defense was to point out to the jury the various inconsistencies in Cook's account of how the incident had happened as those inconsistencies related to the physical evidence and the testimony of other witnesses. Saint told the post-conviction court that he had had two poster boards filled with approximately twenty-some inconsistencies, among them the evidence related to the diaper, and that he had worked through these inconsistencies "for months and months" in advance of trial. He made the final decision to argue that there never was a diaper at trial, as the State's evidence came in. In Saint's opinion, the best strategy at that time was to take the position that there was a total lack of evidence from anyone other than Cook and Sergeant Allcron, who purportedly had destroyed the diaper, that a diaper had ever existed. Again, the goal was to "challenge the sufficiency of the evidence vis-a-vis the burden of proof on the state through the credibility of Gayle Cook.". To argue that there had been a step-in diaper would have been inconsistent with Curry's most recent version of the events and the one the defense

was presenting to the jury, that Cook had not been held hostage.

Saint's testimony is supported by the portions of the trial record placed into evidence at the post-conviction hearing. He pointed out numerous inconsistencies to the jury in an effort to demonstrate that Cook was incredible and the State had failed to meet its burden of proof. The evidence does not lead unerringly to a result different from that reached by the post-conviction court; the decision to argue that there never had been a diaper was shown to be a matter of trial strategy which, even if ultimately detrimental to the defendant, does not establish ineffective assistance of counsel. *Garrett v. State* (1992), Ind., 602 N.E.2d 139, 142.

Curry argues that effective trial counsel would have moved to suppress evidence obtained from the van in which he had held Cook captive and would have objected to its admission. Curry maintains the van had not been properly secured and stored as required by statute, preventing the State from establishing a proper chain of custody for the evidence, and that the evidence, whatever it was, was seized without a warrant.

Indiana Code 34–4–30.1–1(a)(4) and 2(a) provide that a vehicle used by a person to commit kidnapping may be seized by a law enforcement officer if the seizure is incident to a lawful arrest, search or administrative inspection. When property is seized pursuant to the authority of I.C. 34–4–30.1–2(a), the law enforcement agency making the seizure may, pending final disposition, place the property under seal; remove the property to a place designated by the court; or require another agency authorized by law to take custody of the property and remove it to an appropriate location. I.C. 34–4–30.1–2(b).

Curry does not contest that he had been lawfully arrested when the officers first entered the van. Some of the evidence admitted at trial was obtained when the officers entered to free Cook. The remaining evidence was obtained subsequently when state police conducted an inventory of the van pursuant to written policy. Most of the items taken from the van at this time and subsequently admitted into evidence had lit-

tle probative value. Police did, however, seize a yellow legal pad upon which a ransom note had been written in red ink. A handwriting expert compared the handwriting on the legal pad with handwriting samples obtained from Curry and opined that Curry had written the note on the yellow legal pad. Police also took possession of a roll of gray duct tape at this time, and a letter addressed to Curry which demanded that Curry pay thousands of dollars owed.

Assuming that law enforcement officers seized Curry's van pursuant to I.C. 34–4–30.1–2(a), the record of the post-conviction proceedings establishes that the van was kept "under seal" from the time it was placed in the warehouse bay until it was inventoried and then thereafter while stored there. Detective Sergeant Richardson testified that the vehicle was "under seal," (R. 2831), and that Sergeant Allcron was the individual who had sealed it. Sergeant Allcron testified that once the van had been put into the bay, he had the overhead bay door padlocked from the inside with a new padlock and he took both keys. He had the lock on the walkway entry changed also. Officers Allcron and Richardson secured the doors from the inside with evidence tape, which would have been broken if anyone had entered the bay. The doors to the bay were still sealed from the inside upon the officers' arrival to conduct the inventory an hour later. The officers observed no evidence of an attempt to enter the garage during the hour they were waiting for an evidence technician.

Several months after the abduction, when defense counsel wanted to view the vehicle, witness Troy, defense counsel, and a private investigator found evidence tape on the entrance door to the garage itself and also on the van. Troy broke the seal on the garage door and the vehicle itself in defense counsel's presence and initialed and dated the evidence tape. Evidence acquired at this time was used by the defense on Curry's behalf.

Attorney Saint testified that he was convinced that there had been no tampering with the van or its contents. The vehicle had been impounded twenty minutes or so after it had been taken from the scene. He had visited the warehouse on several occasions and inspected the premises.

The chain of custody rule is designed to ensure that during the time evidence is in the possession of law enforcement authorities, there is not a substitution or alteration of the evidence. *Morse v. State* (1992), Ind., 593 N.E.2d 194, 197. The rule applies with diminishing strictness as the exhibits concerned become decreasingly susceptible to alteration, tampering or substitution. *Ives v. State* (1981), 275 Ind. 535, 543, 418 N.E.2d 220, 225. If the offered item possesses characteristics which are fairly unique and readily identifiable, and if the substance of which the item is composed is relatively impervious to change, the trial court is viewed as having broad discretion to admit it merely upon the basis of testimony that the item is the one in question and is in a substantially unchanged condition. *Henning v. State* (1985), Ind., 477 N.E.2d 547, 549 (quoting *Armand v. State* (1985), Ind., 474 N.E.2d 1002, 1005 and *Dier v. State* (1982), Ind., 442 N.E.2d 1043, 1046 (fingerprint card from police records)).

Although the State is required to maintain a chain of custody, it is not required to negate every remote possibility of tampering. *Henning*, 477 N.E.2d at 549. The party offering the evidence need only provide "reasonable assurance" that it passed through various hands in an undisturbed condition, and need only provide evidence that "strongly suggests" the exact whereabouts of the exhibit at all times. *Kennedy v. State* (1991), Ind., 578 N.E.2d 633, 639, *cert. denied*, 503 U.S. 921, 112 S.Ct. 1299, 117 L.Ed.2d 521. The defendant must then present evidence which does more than raise the mere possibility that the evidence could have been tampered with or that a substitution or alteration could have been made. *Id.* (quoting *Gambill v. State* (1985), Ind., 479 N.E.2d 523, 529). Thus, the State need not establish a perfect chain of custody, and any gaps go to the weight of the evidence and not its admissibility. *Kennedy*, 578 N.E.2d at 639. In addition, there is a presumption of regularity in the handling of exhibits by public officers, and a presumption that public offi-

cers discharged their duties with due care. *Id.*

■ An attorney is not held to be incompetent for failing to take an action the client believes to be beneficial when it is apparent he would not have prevailed on an argument in support of that action. *Oglesby v. State* (1987), Ind., 515 N.E.2d 1082, 1084. Before trial counsel's failure to enter an objection may be regarded as ineffective representation, the defendant must show that had the objection been made, the trial court would have had no choice but to sustain it. *Id.*

■ The evidence recited above shows that the vehicle was kept under seal during the periods preceding inventory and trial. A strict chain of custody was not necessary for any of the items which were probative of Curry's guilt. As for the unspecified items of evidence which Curry perceives were potentially the subject of tampering, Curry has offered no evidence from which to infer anything other than a remote possibility of tampering in the one-hour period prior to the inventory. The record therefore does not lead unerringly to a conclusion opposite of that reached by the post-conviction court on Curry's chain of custody claim.

The evidence offered at the post-conviction proceedings also does not lead unerringly to the conclusion that counsel was ineffective for failing to move to suppress or object to evidence seized by law enforcement officers from the van. The vehicle was in plain view when it was seized and at that time police had probable cause to believe both that the van *itself* constituted evidence, as an instrumentality of the crime, and that it *contained* evidence of a crime, in particular, Cook. Police had the van in view while Cook was talking to her husband on the phone from the van. Officers with Mr. Cook were in continuous radio contact with agents watching the van. Therefore, upon its seizure, law enforcement officers could justifiably enter and search the vehicle for evidence of a crime without first having obtained a warrant. *California v. Carney* (1985), 471 U.S. 386, 390, 105 S.Ct. 2066, 2068–69, 85 L.Ed.2d 406.

■ The justification to conduct a warrantless search does not vanish once the vehicle has been immobilized. *Florida v. Meyers* (1984), 466 U.S. 380, 383, 104 S.Ct. 1852, 1853–54, 80 L.Ed.2d 381; *Michigan v. Thomas* (1982), 458 U.S. 259, 102 S.Ct. 3079, 73 L.Ed.2d 750; *Texas v. White* (1975), 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209. The practical considerations that justify a warrantless search of an automobile continue to apply until the entire search of the automobile and its contents has been completed. *United States v. Ross* (1982), 456 U.S. 798, 822 n. 28, 102 S.Ct. 2157, 2171–72 n. 28, 72 L.Ed.2d 572. The scope of the warrantless search authorized by *Carroll v. United States* (1925), 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, is no broader and no narrower than a magistrate could legitimately authorize by warrant. If probable cause justifies the search of a lawfully stopped vehicle, then it justifies the search of every part of the vehicle that may conceal the object of the search. *Ross*, 456 U.S. at 826, 102 S.Ct. at 2173–74. Hence, the fact that the officers delayed searching the vehicle until it had been secured or performed an inventory search of the vehicle contemporaneously does not effect the legality of a search justified by the exception to the warrant requirement recognized by *Carroll*. *See United States v. Johns* (1985), 469 U.S. 478, 105 S.Ct. 881, 83 L.Ed.2d 890; *Chambers v. Maroney* (1970), 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419.

Curry also argues that attorney Saint should have objected to the admission of Cook's clothing because Cook had had the clothing in her possession for several days before she turned the clothing over to the FBI and no witness at the scene other than Cook reported seeing blood on the clothing. Again, Curry raises the potential for tampering.

■ Assuming that these items of clothing possessed great evidentiary value, see the due process discussion *infra*, that counsel should have moved for the exclusion of the clothing, and that such a motion would have necessarily been sustained, we cannot discern a reasonable probability of a different result at trial. Cook testified that she hit her head upon the frame of the car as Curry was pushing her into the vehicle. Cook still had blood in her hair and around the wound

when she was rescued by the FBI agents. A number of witnesses observed the wound to her head, including a physician. The evidence of blood on Cook's clothing simply could not have had a significant impact upon the jury's verdict.

 Curry maintains that attorney Saint withheld exculpatory evidence from Curry, co-counsel, and the jury, namely, the discovery of Cook's hair in the front seat area of the van; the discovery that the telephone cord attached to the pay phone used to contact William Cook would not reach into the rear seating area of the van; and, the discovery that William Cook only heard traffic when he was talking with his wife. Attorney Saint testified at the hearing on Curry's petition that he provided Curry with all of the reports from the defense's private investigators on more than one occasion, (R. 2601), and turned his entire case file over to Curry on several occasions.

Saint did not recall specifically discussing the opinion of the investigator concerning the hair in the front seat with Curry before trial, but Saint testified that he did not offer the evidence of the hair in the front area because the lab technician opined that hair could have been found in various places at the crime scene and the inference was as strong that the hair had gotten there by violence as it was that Cook had been in the front of the vehicle.

As the post-conviction court found, hair wafts. Curry offered no evidence to disprove this assertion at the hearing on his post-conviction petition. Use of the evidence was a tactical decision made by counsel which does not amount to ineffective assistance.

 As for the length of the phone cord and William Cook's ability to hear traffic when he talked to his wife and Curry, whether or not counsel discussed these matters with Curry, counsel did inquire about both at trial, (R. 625) and offered his own witness and exhibits concerning the length of the cord and the distance of the phone from the adjacent street. Curry does not set forth what more would have been gained from a discussion of these matters with him. The intended inference, that the conversation

could not have happened as Cook described it, was placed before the jury. We cannot discern prejudice.

 Curry next alleges that counsel was ineffective for failing to investigate and call certain witnesses, specifically, a waitress at the Big Wheel restaurant, two prostitutes, the woman who had operated a mini-mart at which Curry had stopped, Cook's optometrist, Cook's neighbor, and various character witnesses. Attorney Saint testified that he had stopped by the Big Wheel on numerous occasions but no one at the restaurant had recalled Curry or his van. Curry himself has not tracked down this missing witness. As best we can discern from the brief, the waitress would have testified that Curry had been at the restaurant for an hour and she had seen his van parked under the lights. The jury knew that Curry came and went numerous times while Cook was bound to the chair. The addition of the waitress' testimony would not have altered the course of the proceedings.

A similar result obtains with respect to the evidence Curry maintains would have come from the "dancers" who purportedly would have testified that they had looked inside the van on the evening of the kidnapping. Attorney Saint perceived his chances of convincing these witnesses to come forward and admit their involvement in criminal activity with Curry to be remote. Saint decided against calling them as witnesses because he believed that revelation of their relationship with Curry would only inflame the jury against Curry. Curry was married at the time and Saint did not believe that his sexual involvement with these women spoke well of Curry's character. Hence, the evidence establishes that the decision to call these witnesses was, as it generally is, a matter of trial strategy. *Fugate v. State* (1993), Ind., 608 N.E.2d 1370, 1373. Without an affidavit from the witnesses themselves showing the substance of their testimony, we have no other basis upon which to judge trial counsel's performance. *Id.*

 The decision to call the owner-operator of the mini-mart was also a matter of strategy. Attorney Saint testified that after

haven taken this woman's deposition he decided not to use her as a witness because she was the only witness who could place a stocking cap on Curry's head. Cook testified at trial that at the time of the abduction Curry had been wearing a ski mask, which Saint believed could look like a stocking cap when rolled. Saint thought that this witness' testimony would be far more damaging than anything fruitful which would come from it.

■ Curry maintains that the testimony of Cook's optometrist and that of her neighbor would have disclosed that Curry and Cook had been together prior to the abduction. Apparently, the optometrist's testimony would have also demonstrated that Cook had such visual problems as to make her explanation of having seen the Corolla emblem on the front of the car through a slit in the tape implausible. The neighbor, Jean Campaigne, would have testified "that Curry was visiting Cook's home prior to the alleged Kidnapping."

Curry introduced Dr. Schick's deposition into evidence at the post-conviction proceedings. Dr. Schick testified that Cook sees well without correction; the major reason for glasses was probably eye strain and some help with reading. Without correction, Cook had twenty-twenty vision in her left eye minus a couple of letters and could see a letter of about 3/8" at about twenty feet. Up to arm's length, she could see very well. The record thus does not bear out the implausibility of Cook's statement she was able to read the Corolla emblem on the car. Dr. Schick's testimony would not have altered the outcome of the proceedings; indeed, it might have been harmful.

■ The other witness, Jean Campaigne, testified at trial and her deposition was also included in the post-conviction record. She testified that she saw the van and the Toyota parked in the neighborhood during the two weeks preceding the abduction. And, she saw a man carrying books get into the van. She did not testify in her deposition or at trial that she saw Curry at Cook's home or saw them together.

Lastly, Curry argues that Saint should have called one of the many potential charac-ter witnesses provided Saint by Beth Gustafson. Curry claims that these witnesses could have testified to his excellent financial condition. Again, Curry has not provided us with the substance of these witnesses' testimony by their affidavits; we therefore cannot discern error.

Curry next argues that Saint violated the Rules of Professional Conduct by conceding in final argument without Curry's permission that Curry had stolen the Toyota. The evidence does not lead unerringly to the conclusion that the disclosure was unauthorized. Saint testified that in preparation for trial, he and his co-counsel made a number of tactical decisions by playing them out in front of a mock jury. As part of this process, Saint had surveyed his jury to determine whether it would be helpful to offer the jury a compromise in the form of a concession to the auto theft charge. In the end, Saint decided that giving up the auto theft count might enhance the defense's credibility in the eyes of the jury and he decided "based upon what [he] saw happening with the jury that [it] was the thing to do at that time." Saint testified that counsel talked to Curry about the strategy "on more than one occasion" and Curry did not have any objection to it.

Curry argues that his statements to law enforcement officers were not made knowingly and voluntarily and therefore Saint was ineffective in failing to move to suppress them and object to their admission. Curry argues a mixture of constitutional principles, incorporating Fifth, Sixth and Fourteenth Amendment claims.

Curry made several statements before formal charges were filed. When Curry was under arrest and lying on the ground next to the van, an FBI agent yelled into the van "FBI, Come out with your hands up" and at that point, Curry responded, "I am all alone. It is just me. She's the only one in the van. I would never have hurt her. She hit her head the first time she got into the van and she will tell you that."

After Curry was helped from the ground and patted down, Special Agent Bryan advised him of his *Miranda* rights, and asked his name, date of birth, if he felt alright, and whether he was on any medication. On the

way to the FBI office, Curry heard radio traffic which reported Cook's observation of a knife and gun. Upon hearing the traffic, Curry stated "They were toys. I threw them out of the window of a car at forty miles an hour." The statements were not in response to any questions.

At the FBI office, Special Agent Baird read Curry the contents of an advice of rights form. Curry chose not to talk to the agents and they gathered only descriptive and background information from him. The agents then transported Curry to the Indianapolis FBI office.

During the drive, the agents knew they could not talk to Curry concerning the matter under investigation and both agents felt they did not want to talk to him at all. Neither agent initiated any conversation. Curry asked them questions. He also stated he hoped he had not hurt Cook and asked when the agents had gotten on to him. He stated, "I had this thing planned out so well. It must have been when I was on the phone for so long the last time."

At the Indianapolis office, during the fingerprinting process, Curry "all of a sudden said," "I'll bet a hundred times, I thought of just letting her go." This statement was not in response to any question posed by the agents. Subsequently, the agents did ask Curry his level of education, where he lived, what his address was and "things like that." Curry told them he had been living in the van.

■ The Self–Incrimination Clause of the Fifth Amendment protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature. *Pennsylvania v. Muniz* (1990), 496 U.S. 582, 589, 110 S.Ct. 2638, 2643–44, 110 L.Ed.2d 528. In order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information. *Id.* Only then is a person compelled to be a witness against himself. *Id.*

■ The privilege against self-incrimination protects individuals not only from legal compulsion to testify in a criminal court-

room but also from informal compulsion exerted by law enforcement officers during in-custody questioning. *Id.* at 589, 110 S.Ct. at 2643–44 (quoting *Miranda v. Arizona* (1966), 384 U.S. 436, 461, 86 S.Ct. 1602, 1620–21, 16 L.Ed.2d 694). Special procedural safeguards come into play whenever a person is subjected to custodial interrogation, i.e. either express questioning or its functional equivalent. *Rhode Island v. Innis* (1980), 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297. Absent such interrogation, there is no infringement of the Fifth Amendment rights identified in *Miranda* and no occasion to determine whether there has been a valid waiver. *Edwards v. Arizona* (1981), 451 U.S. 477, 486–87, 101 S.Ct. 1880, 1885–86, 68 L.Ed.2d 378. Hence, under the Self–Incrimination Clause of the Fifth Amendment, only verbal statements preceding an advisement of *Miranda* rights that are both testimonial in nature and elicited during custodial interrogation must be suppressed. *See Muniz*, 496 U.S. at 590, 110 S.Ct. at 2644.

We separate for discussion the statements made by Curry in response to law enforcement questioning, e.g., that he had been living in the van; that he felt ok; that he did not wish to sign the advisement form; and, that he wanted to consult with an attorney, from Curry's other statements. In order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information. *Muniz*, 496 U.S. at 594, 110 S.Ct. at 2646–47. Curry's responses to the officers' requests for his address, descriptive or background information, and how he was feeling physically, thus relate a factual assertion or disclose information. At the time of the *Muniz* decision, a majority of the U.S. Supreme Court would hold these statements to be testimonial in nature. *Muniz*, 496 U.S. at 584, 110 S.Ct. at 2641 (Justices Brennan, Marshall, O'Connor, Scalia and Kennedy all concurring in Part III–B). A different plurality of the court would also hold these responses to be *admissible*, either pursuant to a routine booking question exception which exempts from *Miranda's* coverage questions to secure the biographical data necessary to complete booking or pretrial services, *id.* (Justices

Brennan, O'Connor Scalia and Kennedy concurring in Part III–C), or because the responses are not testimonial in nature and do not warrant application of the privilege. *Id.* (Chief Justice Rehnquist joined by Justices White, Blackmun and Stevens in opinion concurring in result in Part III–C).

■ Here, none of the questions were designed to elicit incriminating admissions, *see Muniz,* 496 U.S. at 602 n. 14, 110 S.Ct. at 2650 n. 14, but were either questions asked routinely of every individual taken into custody or asked to determine whether Curry could be safely transported. (R. 662, 670, 694). Limited and focused inquiries on the part of police normally attendant to arrest and custody do not constitute custodial interrogation. *See e.g. Muniz,* 496 U.S. at 603–4, 110 S.Ct. at 2651–52 (Statements made while performing field sobriety tests and in response to request to take breathalyzer examination); *South Dakota v. Neville* (1983), 459 U.S. 553, 565 n. 15, 103 S.Ct. 916, 923 n. 15, 74 L.Ed.2d 748 (Request to take blood-alcohol test akin to request to submit to fingerprinting or photography).

■ We turn then to Curry's statements in response to the agents' command to others who might be in the van to come out with their hands up; his statements in response to radio traffic advising the officers that Curry may have a gun or knife; his statements on the trip to Indianapolis which were apparently a response to the officers' silence rather than any words or actions on the part of police; and, his statement during fingerprinting that he had thought at least a hundred times about letting Cook go. The term "interrogation" under *Miranda* refers not only to express questioning but also to any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Innis,* 446 U.S. at 300–1, 100 S.Ct. at 1689–90. Since police cannot be held accountable for the unforeseen results of their words and actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating

response. *Id.* at 301, 100 S.Ct. at 1689–90. Thus, in *Innis,* the U.S. Supreme Court held that offhand remarks between officers to each other about the need to continue looking for a weapon because of safety concerns for children in the area did not constitute interrogation under *Miranda.*

■ The record in no way suggests that any of the officers' remarks or actions were designed to elicit a response from Curry. The command to come out of the van was not directed at Curry, but to determine whether Curry was alone. It cannot reasonably be said that the officers should have contemplated that Curry would respond with incriminating testimonial statements to a remark routinely made at the time of apprehension.

The same can be said of the officers' use of the radio while transporting Curry. The communication was intended to warn the officers of the possibility of a weapon; it was not reasonably foreseeable that Curry would respond to the transmission.

■ Plainly, the record supports the conclusion that the agents' silence on the trip to Indianapolis was not intended to elicit incriminating statements; the officers testified that they did not want to talk to Curry and intentionally remained silent so as not to encourage communications from him.

And, the statements made by Curry incident to his fingerprinting were not in any way elicited by the officers. Their acts pursuant to the fingerprinting process are an attendant part of every arrest.

■ The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." The Sixth Amendment right attaches when a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. *McNeil v. Wisconsin* (1991), 501 U.S. 171, 175, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (quoting *United States v. Gouveia* (1984), 467 U.S. 180, 188, 104 S.Ct. 2292, 2297–98, 81 L.Ed.2d 146 and *Kirby v. Illinois* (1972), 406 U.S. 682, 689, 92

S.Ct. 1877, 1882, 32 L.Ed.2d 411 (plurality opinion)). Once this right to counsel has attached and has been invoked, any subsequent waiver during a police-initiated custodial interview is ineffective. *Michigan v. Jackson* (1986), 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631. The Sixth Amendment right, however, is offense-specific; it cannot be invoked once for all future prosecutions. *McNeil,* 501 U.S. at 175, 111 S.Ct. at 2207.

■ The simple response to Curry's Sixth Amendment claim is that the Sixth Amendment right had not yet attached. Each of the statements made by Curry temporally occurred after Curry's arrest but before he had been formally charged.

As for Curry's due process claim, the evidence is at best in conflict. The officers testified that they did not question Curry. Curry insists that the officers were not telling the truth, but he himself did not testify at the post-conviction proceeding. In a lengthy affidavit, Curry avers that he was questioned for five hours, and the statements attributed to him by the officers were taken out of context if he made them at all. Attorney Saint testified that Curry had never informed his attorneys that he had been interrogated by FBI agents. The post-conviction court could resolve this factual conflict against Curry. The record does not lead unerringly to a conclusion opposite that reached by the post-conviction court with respect to Curry's claims that counsel was ineffective for failing to move to suppress and object to statements made prior to the filing of formal charges.

Curry argues that he was denied a fair trial and that Saint was ineffective for failing to seek a dismissal of the proceedings upon discovering that crucial pieces of exculpatory evidence had been mishandled. The State's witness Sergeant Allcron discarded the step-in type adult diaper, which Curry contends would have demonstrated that Cook had lied about having been bound continually. Allcron failed to obtain Cook's undergarments, socks, skirt and slip before they were laundered. Curry insists that Cook's knee socks were critical to his defense because duct tape residue on the socks would have shown that the tape had been removed and replaced several times, contrary to Cook's assertion that she had been bound continuously. Curry also contends that a serology test, cancelled by Allcron, would have demonstrated that the blood on Cook's clothing was not Cook's and that the evidence had been tampered with. Finally, Allcron permitted the van to be stored in a warehouse owned by William Cook's corporation. Had the van not been subjected to tampering, certain personal items belonging to Cook would have been recovered from the van and could have been used to demonstrate that Cook went along with Curry willingly. Curry argues, with respect to each type of evidence, that it could have been used to impeach Cook.

Curry's attorneys made specific requests for the "tangible objects that will be used or could be used in prosecution of the cause;" an inventory of the van; each and every item discovered in the van; items of clothing from the victim; and, all lab requests. The State notified Curry that it intended to introduce the blood-spattered clothing into evidence at trial.

In *Arizona v. Youngblood* (1988), 488 U.S. 51, 59, 109 S.Ct. 333, 338, 102 L.Ed.2d 281, the United States Supreme Court indicated its unwillingness to read the fundamental fairness requirement of the Due Process Clause as imposing on police an undifferentiated and absolute duty to retain and preserve all material that might be of conceivable evidentiary significance in a particular prosecution. The court held that unless a criminal defendant could show bad faith on the part of police, the failure to preserve potentially useful evidence does not constitute a denial of due process. *Id.* The court also dispelled the notion that the Due Process Clause had been violated when police failed to use a particular investigatory tool. The court stated unequivocally that police do not have a constitutional duty to perform any particular tests. *Id.* at 59–60, 109 S.Ct. at 338–39.

■ Thus, Curry was not denied a fair trial or the effective assistance of counsel when Allcron decided to cancel the serology tests on Cook's clothing. Curry learned through discovery that the serology test had been requested and cancelled. Allcron had

decided the test was not needed. The exhibits were available for testing by Curry's own expert.

■ To the extent that Curry is asserting attorney Saint ineffective for failing to test the exhibits to determine whether they contained Cook's blood, Saint only had such a duty if it can be said the evidence would have been material in the sense that its suppression undermines confidence in the outcome of the trial. *U.S. v. Bagley* (1985), 473 U.S. 667, 679, 105 S.Ct. 3375, 3382, 87 L.Ed.2d 481 (utilizing *Strickland v. Washington* standard of prejudice as test of materiality). Evidence is material only if there is a reasonable probability that, had evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. 473 U.S. at 684, 105 S.Ct. at 3384–85.

■ Curry has offered no evidence to establish either of his suppositions—that Cook's clothing had been tampered with or that it contains someone else's blood. He himself told the FBI agents that Cook had hit her head. The agents saw the wound. Cook had blood in her hair. She had treatment for the wound. The officers' failure to observe the blood on her clothing does not equate, as a factual matter, with its nonexistence. Cook has not shown a *reasonable probability* that the result of the proceedings would have been different had Saint requested a serology test.

■ These same principles apply with equal force to Curry's contentions that the State was required to preserve the diaper worn by Cook during the kidnapping, her undergarments, and knee socks. Whatever duty the Constitution imposes on the State to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. *California v. Trombetta* (1984), 467 U.S. 479, 489–90, 104 S.Ct. 2528, 2534–35, 81 L.Ed.2d 413. To meet this standard of constitutional materiality, the evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonable means. *Id.*

■ Sergeant Allcron testified that when he received the diaper from Cook, he perceived that it had no evidentiary value. He decided to destroy the diaper immediately because he believed that it posed a health hazard. Again, Curry has offered no evidence of bad faith, other than his own supposition, nor does he argue that the diaper's evidentiary value to the defense would have been readily apparent. At best, Curry has shown that the diaper might have been useful to the defense. The Due Process Clause does not require the State to preserve evidence that fits this description.

■ As for the socks, again there is no showing of bad faith or that it was readily apparent to the State that the tape residue on the socks would be material. Cook testified that she laundered some of the clothing and disposed of others. There is no evidence that anyone directed her to do so. Cook testified that she was continuously bound at the feet and to the chair throughout the twenty-six-hour ordeal. The FBI agents found her feet bound with cord at the time of her rescue. Again, the possibility that Curry might have secured her with tape as well and removed and reapplied it does not necessarily mean that Cook had not been bound, with the cord, the entire time as she testified. Curry simply has not shown that, had the tape residue on the socks been preserved for inspection by the defense, it was of such a character as to create a reasonable probability of a different outcome.

■ We have already fully addressed Curry's theory of tampering with respect to the evidence potentially contained in the van. He now asserts however that had the State properly secured the van, they would have discovered at least three personal items belonging to Cook which would have demonstrated that she was lying about her participation in the crime. As we stated earlier in this opinion, Curry has offered no evidence whatsoever that anyone tampered with the van during the brief one-hour period the police were not physically present. To the contrary, all of the evidence offered in these

proceedings permits the conclusion that no tampering occurred. But, apart from that, Curry offered no evidence, not even his own testimony, establishing either that the items he claims were Cook's and in the van ever existed or could be linked to her. This being the case, he has not established the items' materiality.

■ Other than an accumulation of error claim, which it should be apparent has no merit, one ineffective assistance of counsel claim remains: Curry's contention that Saint was ineffective in failing to object or move to strike the criminal confinement count on double jeopardy grounds. While not precisely the error raised by Curry, there is a double jeopardy question here which we address sua sponte. *See Mason v. State* (1989), Ind., 532 N.E.2d 1169, 1171, *cert. denied,* 490 U.S. 1049, 109 S.Ct. 1960, 104 L.Ed.2d 428.

■ The double jeopardy clause bars separate conviction and sentencing on a lesser crime where the conviction of a greater crime cannot be had without conviction of a lesser crime and sentence is imposed on the greater crime. *Id.* at 1171; *Boze v. State* (1987), Ind., 514 N.E.2d 275, 277. In the double jeopardy context, a second conviction is an additional punishment even if that conviction results in a sentence which runs concurrent with the first conviction. *McBroom v. State* (1988), Ind., 530 N.E.2d 725, 727. Hence, the proper remedy is to remand to the trial court for a new sentencing order which vacates the conviction and sentence on the lesser count. *See e.g. Mason,* 532 N.E.2d at 1172; *Abron v. State* (1992), Ind.App., 591 N.E.2d 634, 637, *trans. denied.*

In Indiana, the crimes of kidnapping and criminal confinement can each be accomplished in one of two ways, i.e. by confinement or removal. Indiana Code 35–42–3–2 can be violated when a person knowingly or intentionally confines another person with intent to obtain ransom or knowingly or intentionally removes another person by force or threat of force. Under count I of its information, the State charged that Curry "did knowingly and feloniously remove, by force, another person, to-wit: Gayle T. Cook" from her home to a 1978 Toyota, with the intent to obtain ransom "to-wit: $1.7 million dollars in

U.S. Currency and Gold Bullion," in violation of I.C. 35–42–3–2.

Similarly, the confinement statute is violated when a person knowingly or intentionally confines another person without the other person's consent or removes another person by force or threat of force from one place to another. Count II alleges that on or about March 15, 1989, in Monroe County, Indiana, Arthur Curry did knowingly or intentionally confine Gayle T. Cook, without her consent by, tieing her to a seat in a 1989 Ford Econoline Van, resulting in serious bodily injury to Gayle T. Cook, to-wit: extreme pain, in violation of I.C. 35–42–3–3. With respect to each statutorily-defined offense, kidnapping or confinement, the legislature has defined but one crime which may be committed in two distinct ways. *See Idle v. State* (1992), Ind.App., 587 N.E.2d 712, *trans. denied.*

■ Kidnapping, like confinement, involves an element of unlawful detention. It is a continuing crime; it is continuously committed so long as the unlawful detention lasts. *Id.* at 716. Whether a kidnapping incident may result in two separate convictions depends in large part upon whether the detention which inheres in it may be divided and prosecuted in separate parts. *See e.g. id.* at 716. A violation of the kidnapping statute during one continuous confinement may result in only one conviction, notwithstanding that the defendant engaged in two different acts, one proscribed in subsection one and the other in subsection two. *See id.* at 718.

■ A confinement ends when the victim both feels and is, in fact, free from detention. *See id.* at 717. A separate confinement begins if and when detention is reestablished. *Id.*

■ The evidence offered at Curry's trial establishes only one continuous confinement. Cook was confined and removed from one place to another, but she was never free from detention during the twenty-six-hour confinement and she herself testified that, even during Curry's absences from the vehicle, she did not feel free to attempt an escape

because she did not know if she was being watched. Under these circumstances, Curry can be convicted and sentenced of only one offense and his conviction of criminal confinement must be vacated. Judgment and sentence may not be entered against the defendant for the included offense. I.C. 35–38–1–6.

## II.

■ Curry maintains that he was coerced into foregoing his right to testify by his counsels' threats to withdraw if he chose to testify and that the denial of this right constitutes fundamental error. On this point, the post-conviction court found that Curry had failed to prove by a preponderance of the evidence "that trial attorney Saint denied the petitioner his constitutional right to testify by demanding that the defendant release him as counsel if he chose to testify."

At the post-conviction proceedings, both of Curry's attorneys delineated the reasons they had advised Curry not to testify. The reasons were these: that given the version of events which Curry had settled upon, namely, that he and Cook had conspired together to stage the kidnapping but she had backed out at the last minute and he had forced her into the car, that Curry would convict himself by his own admission; that Curry's attorneys had grave concerns about suborning perjury because Curry's latest account conflicted with detailed written statements he had given them in the past and they ethically could not put him on the witness stand knowing that he was going to perjure himself; and finally, that the State had a rebuttal witness who was prepared to testify that Curry had admitted his guilt to the witness when they were in jail. The attorneys denied that they had communicated to Curry an intent to withdraw if he decided to testify and both testified that Curry's direct examination had been carefully prepared in the event that he chose to testify.

Although the attorneys had discussed the matter of whether to testify with Curry on several occasions, months before the trial, they drafted an advisement form explaining the right to testify because they perceived that Curry was not dealing with them in good faith and they wanted a memorial of exactly what had been discussed. When the final decision was made in the jury room after the State's case-in-chief, Curry appeared to be alert and to understand what the discussion was about and what the document said. Curry did not state unequivocally at this time to either attorney that he desired to testify. He had changed his mind on the matter repeatedly throughout the proceedings. After the decision had been made, Curry told the trial judge that he concurred in his attorneys' advice. He would not sign a waiver form but he had decided not to testify. The court specifically asked him if the decision was of his own free will. Curry stated that it was a decision he had chosen to live with.

Again, the evidence does not lead unerringly to a conclusion contrary to the one reached by the post-conviction court upon the evidence. Curry has failed to prove by a preponderance of the evidence that he was denied the right to testify by threats of withdrawal from his attorneys.

## III.

Lastly, Curry argues that the post-conviction court erred in denying his belated request for the appointment of counsel to assist in the preparation of this appeal. In his petition for post-conviction relief, Curry stated that he did not desire counsel either to bring the petition or an appeal from the denial of a petition.

The post-conviction court held a hearing on the matter on December 2, 1992 and "interrogated Curry as to his right to counsel in these proceedings and the consequences which might result if he was not represented by counsel." On December 2, 1992, Curry executed a written waiver before the Court, waiving in writing his "right to be represented by counsel in these proceedings for post conviction relief." Although Curry did not make a transcript of that hearing a part of the record, we deemed it necessary to review a transcript of that hearing and issued a writ of certiorari for it on October 18, 1994. The post-conviction court promptly complied with our request.

The post-conviction court noted Curry's decision on representation at the start of the hearing on Curry's petition, advising Curry a second time against proceeding pro se and offering to appoint counsel but Curry again declined representation. It was not until Curry's petition had been denied and he was confronted with the intricacies of appellate procedure that he claimed entitlement to appointed counsel.

The right to counsel in post-conviction proceedings is guaranteed by neither the Sixth Amendment of the United States Constitution nor Article 1, § 13 of the Indiana Constitution. *Baum v. State* (1989), Ind., 533 N.E.2d 1200, 1201. The states have no obligation to provide a collateral avenue of relief; when they do, the fundamental fairness mandated by the Due Process Clause does not require that the State supply a lawyer as well as collateral review or provide procedures designed solely to protect the right to appointed counsel which extends to the first appeal of right. *Pennsylvania v. Finley* (1987), 481 U.S. 551, 558, 107 S.Ct. 1990, 1994–95, 95 L.Ed.2d 539. Curry concedes that there is no Sixth Amendment right to assistance of counsel in post-conviction proceedings.

The Post–Conviction Rules do give an indigent post-conviction petitioner the option of filing an affidavit of indigence and thereby obtain the assistance of a public defender, or of proceeding pro se. Ind.Post–Conviction Rule 1, § 9(a); *Howard v. State* (1991), Ind., 576 N.E.2d 1253. A petitioner cannot elect both options. *See id.* He may chose to proceed pro se or to request the services of a public defender. *Id.* at 1254. A petitioner who chooses to institute proceedings pro se cannot demand that the trial court act as lifeguard and rescue him later because, in hindsight, he believes that he made an incorrect choice. *Id.* A defendant expressly informing the trial court that he did not wish the assistance of counsel cannot later cry foul because the trial court abided by his wishes. *Howard v. State* (1991), Ind., 581 N.E.2d 925, 926. The constitutional standards for waiving the right do not apply in the post-conviction setting. *Carter v. State* (1990), Ind.App., 560 N.E.2d 687, 689.

Indiana may make the choice of providing petitioners the assistance of counsel without requiring the full panoply of procedural protections that the Constitution requires in other circumstances. *See Finley*, 481 U.S. at 560, 107 S.Ct. at 1996.

The State of Indiana provided Curry with the opportunity to be represented at post-conviction proceedings by court-appointed counsel should he be indigent. Curry signed a written waiver in which he averred that he understood his right to be represented during post-conviction proceedings by the public defender and that no promises of leniency or threats had been made to coerce him into waiving this right. At the hearing on Curry's petition, the post-conviction judge reiterated his recommendation that Curry not proceed on his petition without the assistance of counsel. Curry declined again on the record. The post-conviction court is not required to monitor Curry's self-representation after an express waiver. We conclude that Curry was not denied the opportunity to be represented by counsel in post-conviction proceedings.

Nonetheless, Curry maintains that because his post-conviction proceeding was effectively his first appeal as of right, he was entitled to the appointment of counsel. As we have indicated, the post-conviction court conducted a hearing on Curry's clear and unequivocal request to proceed pro se and fully developed Curry's awareness of the implications, consequences and risks of self-representation. *See Leonard v. State* (1991), Ind., 579 N.E.2d 1294. The court inquired into Curry's educational background; his ability to read and understand the English language; Curry's knowledge of the law and rules which would govern the proceedings; the extent of Curry's experience with the criminal justice system; and Curry's reasons for not wanting the assistance of the Public Defender's office. The court asked Curry whether he had ever had treatment of any kind for mental illness, was under a physician's care, taking any kind of medication or under the influence of drugs or alcohol, and whether he felt he needed the assistance of the Public Defender's office. The court informed Curry that if he wished the assistance of counsel, that the court was

obligated by law to appoint the State Public Defender to represent him; that the appointed attorney would be knowledgeable in court procedures, rules of evidence and the law that governs the proceedings, including technical matters which might come up; that a person proceeding without a lawyer does not have a constitutional right to receive personal instruction from the trial judge on courtroom procedure, to have the judge take over chores for a pro se defendant that would normally be attended to by trained counsel, or have a continuance of the matter should the pro se petitioner become confused or frustrated; and, that should he become disruptive, permission to proceed without counsel could be revoked, which might have a devastating effect upon the outcome. The court discussed with Curry the skills a trained lawyer would have, such as the ability to assess the merits of the defenses that have been interposed by the State; investigate and interrogate witnesses; gather appropriate documentary evidence; obtain favorable witnesses; prepare and file pre-hearing motions; present favorable opening and closing statements; recognize objectionable and prejudicial evidence; and make proper objections. Curry indicated that he understood that his right to proceed pro se could be revoked; that the P–C rules would govern the way the action would be heard by the court; that the rules of evidence would apply and be applied by the court; that he would have to proceed by question and not simply tell his story; and that in the court's opinion it would be better that Curry have a trained lawyer to represent him. Curry stated that he made the decision to represent himself voluntarily and that no one had pressured him to waive his right to representation by counsel. Curry even corrected the court when the court stated that the state and federal constitutions required that he appoint counsel.

In sum, the record reflects that Curry had been well informed about the import of his decision to proceed without counsel. He made the decision to represent himself voluntarily, with full knowledge of the consequences. The trial court committed no error in granting Curry's request.

Judgment affirmed, and the cause is remanded with instructions to vacate the conviction and sentence of criminal confinement.

SHARPNACK, C.J., and RUCKER, J. concur.