Albert Dean **SAMANIEGO** a/k/a Horse Dean Albert Samaniego, Appellant,

v.

**STATE of Indiana, Appellee.**

No. 01S00–8812–CR–1009.

Supreme Court of Indiana.

April 24, 1990.

Rehearing Denied July 12, 1990.

John R. Wilks, Wilks and Kimbrough, Fort Wayne, for appellant.

Linley E. Pearson, Atty. Gen., and Danielle Sheff, Deputy Atty. Gen., Indianapolis, for appellee.

GIVAN, Justice.

A jury trial resulted in the conviction of appellant of Burglary, a Class A felony, for which he received a sentence of fifty (50) years enhanced by eight (8) years by reason of his status as a habitual offender and Attempted Deviate Conduct, for which appellant received a fifty (50) year sentence, the sentences to run consecutively.

The facts are: In June of 1987, the victim and her 2–year–old daughter returned home at approximately 9:00 p.m. During her absence, the victim had left her house unlocked. However, upon returning home, she locked the door for the evening. Shortly after she retired, her daughter told her there was a man in the house. Appellant thought the child was attempting simply to avoid going to bed.

However, the victim soon discovered a man in fact was in the house. The man grabbed the victim and repeatedly told her

to quiet the child or he would kill her. The man jerked the victim out of bed, placed a knife to her throat, and pushed her into a hallway where he forced her to her knees in order to perform fellatio. He told her that he would kill her if she did not comply. The victim then told the attacker that he would have to kill her.

In an ensuing struggle, the attacker pushed the victim down several steps to a landing. She then was pushed down the rest of the steps. After the attacker and the victim were at the bottom of the stairway, the attacker grabbed the victim's hair and repeatedly hit her head against the wall. The victim also received cuts from the knife held in the attacker's hand. During the melee, the victim tore from her attacker's hand a portion of a finger of a rubber glove.

Neighbors who had been alerted by the victim's screams were outside the home when the attacker and the victim ran out of the house. One of the neighbors, Rex Grant, followed the man, who he identified as appellant, to a nearby alley. The appellant ran toward a lumberyard then back to his truck, which was parked in the alley. Another neighbor, Dan Aguilar, was carrying a flashlight when he came to investigate. Mr. Aguilar and his daughter, Diana Aguilar, saw a man, whom they later identified as appellant, approach a red and white Ford pickup truck from the direction of the lumberyard.

Mr. Aguilar questioned appellant who stated he had a problem with his truck and had been at a friend's house. Mr. Aguilar shined the flashlight on appellant and continued to question him because he knew of the attack. Mr. Aguilar was especially interested in identifying appellant because Mr. Aguilar had been told that the attacker might be Hispanic, and he initially believed appellant was Hispanic. Diana Aguilar recognized appellant as a man whom she had seen mowing the lawn at the nursing home where she was employed.

Appellant told Aguilar that he lived in the Belmont Estates area of Decatur. Within an hour of the attack, police located appellant's truck and proceeded to question

appellant. He admitted that he had been in the area of the attack that evening but claimed his truck had run out of gas. He told police officers that his small son accompanied him that evening. However, a neighbor told police that appellant's son had been in her care for approximately one and a half hours.

Because of the descriptions from the various witnesses of appellant and the truck, the police placed appellant under arrest. A further check disclosed that the license plate number on the truck seen in the alley was the same as the license plate number of appellant's truck.

Following appellant's arrest, a search at the jail produced two medallions, a pocketknife, and marijuana. Appellant's wife permitted police to search their residence. She told police officers that she owned a pair of pink rubber dishwashing gloves. However, when she attempted to show them to the police, she discovered they were missing.

After receiving medical attention at the hospital, the victim returned to her home and discovered a fingertip from the rubber glove and a silver necklace in her home. A pair of pink rubber gloves found near the lumberyard, where appellant had stopped briefly after he ran into the alley, had a fingertip missing which matched the fingertip found in the victim's home.

The silver necklace found in the victim's home was identified by appellant's wife as a necklace worn by appellant to which the medallions were attached which were found on appellant's person when he was searched at the jail. Appellant's wife further told the police officers that she and her husband had watched a movie, "Don't Answer the Phone." The wife expressed concern because the subject of the movie in many ways paralleled the attack on the victim in this case.

Friends of appellant, Ken and Dana Lee Moses, had a conversation with appellant on the afternoon before the attack on the victim and he told them that he had watched the movie and wanted to do the things that were done in the movie. He stated that his wife "never gave him any,"

and that he was going to get some if he had to use force. He indicated the type of sexual activity he was seeking was fellatio. He also showed Ken and Dana a knife which he carried in his shoe.

A few hours after the incident, four of the witnesses who had been alerted by the victim's screams, were taken to the jail where each was permitted to view appellant through a window in the cell and each identified him as the person they had seen coming out of the victim's apartment and running down the alley.

While appellant was awaiting trial, he told a cellmate that he committed the crime. The cellmate, Douglas Barnett, testified that appellant told him in detail how the attack took place. The details matched the testimony of other witnesses in the case. On cross-examination, Barnett was asked if he had read in the newspapers any of the details he had recited. He replied that he had never read a newspaper article concerning the case and that everything he knew had been told to him by appellant while they were cellmates.

When asked why he gave the police this information, he stated that at first he thought it might do him some good, but that in fact he received no benefit from any information he had furnished and that he had served out his sentence.

■ Appellant claims the trial court erred in denying his motion to suppress identification testimony. He first claims that the identification at the jail by the various neighbors of the victim was an impermissible one-on-one showup which was unnecessarily suggestive and thus inadmissible, citing *Stovall v. Denno* (1967), 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199. Appellant is correct in his observation of the law as it applies to a police lineup conducted some time after the occurrence under which the defendant is charged.

However, it also has been held that where witnesses are available a short time after the occurrence, it is entirely proper to permit witnesses to view the accused because at such a time their recollection is fresh and many times the accused is wear-ing some, if not all, of the same clothing he was wearing at the time of the alleged attack. *Savage v. State* (1988), Ind., 523 N.E.2d 758; *Linthicum v. State* (1987), Ind., 511 N.E.2d 1026. In determining whether a particular identification is impermissibly suggestive, this Court will consider whether a substantial likelihood of misidentification existed in light of all the circumstances. *Id.*

Appellant also claims the identification was not worthy of belief because the victim herself could not identify the attacker because he wore a stocking over his face, and further that three of the identifying witnesses had named other individuals who they thought might be the attacker. All of this evidence was submitted for the jury's consideration.

Appellant recognizes that this Court will not reweigh the evidence; he claims, however, that the evidence in this case is so contradictory that it should not be believed. We cannot agree with appellant in this observation. There is sufficient evidence in this case to submit the question to the jury. We find no reversible error in the trial court's ruling refusing to suppress the identification testimony.

■ Appellant contends the trial court erred in its denial of his motion to suppress evidence. Appellant sought to suppress items such as a pocketknife, a charm, a nickel, and a bag of marijuana seized at the Adams County Jail at the time he was processed. It is appellant's position that there was no probable cause for him to be taken into custody at that time, and in the absence of probable cause, any fruits of the arrest should have been suppressed.

However, the facts as above recited demonstrate that the officers had probable cause to believe appellant had perpetrated the attack. We see no reversible error in the trial court's refusal to suppress evidence found upon appellant at the time of his arrest. *Green v. State* (1984), Ind., 461 N.E.2d 108.

■ Appellant claims the trial court erred in its denial of his motion in limine.

Appellant's motion sought to suppress any evidence that appellant had watched a videotape entitled, "Don't Answer the Phone." The trial court first granted the motion in limine. However, after further presentation by the State concerning appellant's statements regarding the movie, the trial court allowed limited evidence of appellant's viewing of the movie and his reaction thereto as described by his acquaintances as above set out.

■ There is evidence in this case from which the jury could find that appellant did in fact watch the movie, that the subject matter set the pattern for the perpetrated crime, and that appellant had expressed interest in committing acts similar to those depicted in the movie. Evidence which legitimately tends to connect a defendant with a crime is admissible when reasonable inferences may be deduced from the evidence. *Jones v. State* (1989), Ind., 536 N.E.2d 267; *Underwood v. State* (1989), Ind., 535 N.E.2d 507.

We see no reversible error in admitting the evidence of the movie and appellant's reaction thereto.

■ Appellant claims he was prejudiced by the misconduct of the trial judge in permitting irregularities in the proceedings and in permitting his wife to photograph some of the proceedings. The only statement we see in the record regarding the purpose of the photographs is "for the jury reunion book." The *Code of Judicial Conduct*, Canon 3(A)(7) prohibits, with a few noted exceptions, the taking of photographs in the courtroom and areas immediately adjacent thereto during sessions of the court or recesses between sessions. One exception listed is "for the perpetuation of a record, or for other purposes of judicial administration." Canon 3(A)(7)(a).

We cannot say from this record whether the judge violated Canon 3. In the absence of some specific showing, we must extend him the benefit of the doubt and presume that he did not violate the canon. In any event, appellant has not demonstrated in what manner he was prejudiced by the taking of the photographs. There is no evidence that the photographs in any way were embarrassing or that they received any undue publication.

■ Appellant also contends the trial judge was guilty of misconduct in that at times of recess when he was giving proper admonishment to the jury, he would overemphasize their public service and in doing so indicate he favored the law enforcement side of the case. A specific example cited by appellant was the judge's statement to the jury that they would be rewarded because of their unusual service to the state in that they would be taken to a nice restaurant some distance from the court in police cars through stop lights with their red lights and sirens on.

It is of course entirely proper, in fact it is a duty of the court, to see that jurors are properly fed and cared for during the course of a jury trial. However, we must agree to some extent with appellant that the judge's action in this regard seemed to be overly dramatic and to exceed the bounds of judicial discretion. We cannot join appellant in holding that this is reversible error. It would seem an insult to the intelligence of the jury, in the face of the evidence in this case, that their decision could be swayed by an overdramatic ride in a police car to a posh restaurant. Although the judge's conduct in this regard is not to be emulated, we cannot say that it amounts to reversible error.

■ Appellant contends there is insufficient evidence to support his conviction. Here, appellant reiterates his attack on the identification evidence dealt with above and the other evidence which appellant sought to have suppressed. As above stated, there was ample evidence in this case to go to the jury for its consideration and that finding will not be second-guessed by this Court. The evidence in this case is sufficient to support the verdict of the jury.

■ Appellant claims he was deprived of his constitutional right to speak at the sentencing hearing because the trial judge appeared at the hearing with a lengthy sentencing statement which obviously had been prepared prior to the hearing. He

argues this obvious fact intimidated both appellant and his attorney to the extent that they declined to make a statement when asked if they had anything to say prior to sentencing.

As the law in Indiana has evolved in recent years, we have required courts to make more thorough investigations and advisements of rights at sentencing. A trial judge certainly would be remiss if he assumed the bench for a sentencing hearing without prior preparation. However, the necessity of prior preparation does not mean that the judge has come to final terms with the sentence to be imposed. He certainly would have the right—in fact, the duty—to listen to the defendant and his counsel in any plea for leniency they might seek to present.

We cannot agree with appellant's statement that a seasoned trial lawyer would be intimidated by a judge assuming the bench with papers which obviously had been prepared prior to the hearing. In fact, there is nothing in this record to indicate other than that the judge made a courteous offer to counsel to make any statement he wished. There is no sign of intimidation in this record. We see no reversible error in this regard.

■ Appellant contends the imposition of a fifty (50) year sentence enhanced by eight (8) years and a second fifty (50) year sentence to be served consecutively is manifestly unreasonable and should be reduced by this Court pursuant to Rules 1 and 2 of the Rules for the Appellate Review of Sentences. In passing sentence in this case, the trial judge gave a very detailed recitation of the evidence which had been presented to the jury.

He then recited the fact that at the time of the commission of the instant offense, appellant was on parole or probation from his conviction for forgery committed in Ohio. The trial judge stated that he had calculated the mitigating circumstances and the aggravating circumstances and then proceeded to set them out in detail as shown by the record.

The judge found that appellant had a long history of criminal activity, having no less than seven criminal convictions in at least three different counties in Ohio. He also found that appellant had an extensive juvenile record and that his first offense as an adult occurred at eighteen years of age when he was convicted of breaking and entering in Marion County, Florida.

The judge further found that appellant was in need of correctional rehabilitation. The judge recited the facts that appellant had attacked the victim; had cut her so badly she was treated at a hospital; had banged her head against the wall; had threatened two lives—both the victim and the victim's daughter; that at the time he made the threats he had the present ability to carry them out; and that he was holding a knife with which he in fact injured the victim. The court further found there were no mitigating factors in the case and for those reasons he imposed the maximum sentence.

We see nothing in this record which would justify this Court in overriding the trial court and ordering a lesser sentence imposed.

Appellant contends he was prejudiced and deprived of a fair trial due to the incompetency of the representation of his trial counsel. Appellant claims the record is replete with witness after witness being examined by the State with leading and suggestive questions to which no objections were made and that these witnesses were permitted to testify to inadmissible hearsay, all to his prejudice.

■ To support these allegations, appellant alludes to many of the issues already discussed in this opinion. In each of these, he claims that his counsel was ineffective for not obtaining the exclusion of the evidence. He also criticizes trial counsel for not challenging the trial judge when he overly praised the jury and when he sent them to a restaurant with a police escort. When a trial judge is praising the jury and offering them a reward for their services, trial counsel is hardly in a position to risk the ill will of the jury by contradicting the judge at that time.

■ He also criticizes trial counsel for not objecting to a report made by police officer Larry Pritchard, who had suffered a heart attack by the time of the trial and whose report was read into evidence. Appellant criticizes the report because it referred to "rape," "rape investigation," and "rape evidence" when in fact rape was not charged nor was any rape perpetrated.

Although the officer's report was of minimal relevance and probably should not have been placed in evidence, we cannot say that remarks in a police report, which obviously were made early in the investigation, could be so detrimental that failure of counsel to intervene by objection would be cause for reversal.

■ Appellant also contends counsel was ineffective because he filed no motion for directed verdict at the close of the State's case or at the close of the defense case. Although it is generally recommended that defense counsel file such motions, we cannot say that failure to do so constitutes incompetent representation. It hardly can be imagined in the face of the evidence presented in this case that such motions would have been granted.

■ Although we require counsel to provide reasonably effective assistance, *Townsend v. State* (1989), Ind., 533 N.E.2d 1215, isolated poor strategy, inexperience, or bad tactics do not necessarily rise to the level of ineffective counsel. *Burr v. State* (1986), Ind., 492 N.E.2d 306. An examination of the record in this case indicates counsel vigorously defended appellant and was well prepared to cross-examine the State's witnesses. The record in this case is comprised of 1,635 pages, a large number of which constitute hard-fought courtroom litigation. Under the circumstances, we cannot say appellant's representation violated the guidelines set out in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

The trial court is affirmed.

SHEPARD, C.J., and PIVARNIK, J., concur.

DeBRULER, J., concurs in result with separate opinion in which DICKSON, J., concurs.

DeBRULER, Justice, concurring in result.

It was about 9:30 p.m. on June 22, and dark. Jackie Geimer and Brenda Grant stood side-by-side, along with the Grant children, and observed a man fleeing from the victim's residence. Geimer said he was wearing a mask and looked like Tim Gage. Brenda Grant said he was not wearing a mask and looked like David Eguia. Grant's children were ordered home and, while on the way, they saw the man run past a pickup truck which was parked in the neighborhood and saw that he did not get into the truck. The children ran on for another 100 to 150 feet and, upon arriving home, told their father, Rex Grant, what had happened. He then went out the door, got on his ten-speed, and reached the truck. His testimony described his recollection as follows:

I seen a man running down the alley and when he got three-quarters of the way down was when I first seen him and then he ran a little farther down towards the depot he went over towards the depot then bent over and from what I seen just bent over and then he got back up and started running back towards a truck which was parked on the southside of the alley.

Several neighbors joined Rex Grant at the truck as the approaching man reached the truck. It was appellant. He was perspiring. They spoke with him as they shined a flashlight on his face. Appellant then drove off. When appellant was arrested, he stated that he had been parked there because he had run out of gas.

Within an hour, appellant was arrested in his home, taken to the police station and locked alone in a cell. At about 12:20 a.m., the police led Brenda Grant and three others from the scene to the door of the cell and asked each to look in at a man they had picked up. Brenda Grant identified appellant from his facial features. The others also made positive identifications. At trial, Brenda Grant and the other three

testified, without objection, that they had identified appellant when looking into the cell at the jail. At trial, Brenda Grant, without objection, also pointed out appellant as the man she had seen run from the house of the victim, though all the other witnesses testified that the man was wearing a mask at the time and, by reason of it, were unable to identify appellant as that man.

The conduct of the police in permitting the witnesses to confront the prisoner under these circumstances was a gross violation of the constitutional rules governing identification procedures. This confrontation occurred more than two hours after the crime, at the stationhouse, after an arrest on probable cause for the crime under investigation. It did not occur shortly after the crime, on or near the scene of the crime. It did not therefore come under the McPhearson exception to the Wade–Gilbert rule for immediate on-the-scene showups, where there is hot pursuit and the lack of facility to produce a photo array or run a live line-up. *Dillard v. State* (1971), 257 Ind. 282, 274 N.E.2d 387. The police procedure employed here was highly suggestive of guilt and totally unnecessary, and deserves the strongest judicial condemnation. There was, however, no contemporaneous objection to the crucial identification testimony of Brenda Grant at trial, and the claim of inadmissibility is therefore deemed waived. *Zion v. State* (1977), 266 Ind. 563, 365 N.E.2d 766.

If this issue had been properly raised and preserved, I would vote to reverse and order a new trial at which all identification testimony of Brenda Grant would be excluded, as would the testimony of the other witnesses describing their identification of appellant in jail. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Brenda Grant's opportunity to view the running man was very limited. The necklace found at the scene was described as merely looking like one worn by appellant. The rubber glove evidence showed no more than that appellant was in the alley, a location he admitted being in. The testimony of appellant's confession was produced by a fellow prisoner, an unreliable source.

Weighing all the factors, I would find a substantial likelihood of misidentification.

DICKSON, J., concurs.