**Albert Dean SAMANIEGO, Appellant–Petitioner,**

**v.**

**STATE of Indiana, Appellee–Respondent.**

**No. 01A02–9505–PC–264.**

Court of Appeals of Indiana.

May 12, 1997.

Transfer Denied July 11, 1997.

Sullivan, J., concurred in result.

---

Susan K. Carpenter, Public Defender, Randy A. Elliott, Deputy Public Defender, Indianapolis, for Appellant–Petitioner.

Pamela Carter, Attorney General, Suzann Weber Lupton, Deputy Attorney General, Indianapolis, for Appellee–Respondent.

## OPINION

KIRSCH, Judge.

Albert Samaniego appeals from the denial of his petition for post-conviction relief. He presents several issues which we consolidate and restate as follows:

I. Whether the State withheld material evidence favorable to the defense;

II. Whether such evidence constituted newly discovered evidence;

III. Whether some of the prosecutor's remarks constituted fundamental error; and,

IV. Whether Samaniego received ineffective assistance of trial and appellate counsel.

We affirm.

## FACTS AND PROCEDURAL HISTORY

The facts underlying Samaniego's conviction were set forth by our supreme court in his direct appeal:

"[On June 22, 1987], the victim and her 2–year–old daughter returned home at approximately 9:00 p.m. During her absence, the victim had left her house unlocked. However, upon returning home, she locked the door for the evening. Shortly after she retired, her daughter told her there was a man in the house. Appellant thought the child was attempting simply to avoid going to bed.

"However, the victim soon discovered a man in fact was in the house. The man grabbed the victim and repeatedly told her to quiet the child or he would kill her. The man jerked the victim out of bed, placed a knife to her throat, and pushed her into a hallway where he forced her to her knees in order to perform fellatio. He told her that he would kill her if she did not comply. The victim then told the attacker that he would have to kill her.

"In an ensuing struggle, the attacker pushed the victim down several steps to a landing. She then was pushed down the rest of the steps. After the attacker and the victim were at the bottom of the stairway, the attacker grabbed the victim's hair and repeatedly hit her head against the wall. The victim also received cuts from the knife held in the attacker's hand. During the melee, the victim tore from her attacker's hand a portion of a finger of a rubber glove.

"Neighbors who had been alerted by the victim's screams were outside the home when the attacker and the victim ran out of the house. One of the neighbors, Rex Grant, followed the man, who he identified as appellant, to a nearby alley. The appellant ran toward a lumber yard then back to his truck, which was parked in the alley. Another neighbor, Dan Aguilar, was carrying a flashlight when he came to investigate. Mr. Aguilar and his daughter, Diana Aguilar, saw a man, whom they later identified as appellant, approach a red and white Ford pickup truck from the direction of the lumberyard.

"Mr. Aguilar questioned appellant who stated he had a problem with his truck and had been at a friend's house. Mr. Aguilar shined the flashlight on appellant and continued to question him because he knew of the attack. Mr. Aguilar was especially interested in identifying appellant because Mr. Aguilar had been told that the attacker might be Hispanic, and he initially believed appellant was Hispanic. Diana Aguilar recognized appellant as a man whom she had seen mowing the lawn at the nursing home where she was employed.

"Appellant told Aguilar that he lived in the Belmont Estates area of Decatur. Within an hour of the attack, police located appellant's truck and proceeded to question appellant. He admitted that he had been in the area of the attack that evening but claimed his truck had run out of gas. He told police officers that his small son accompanied him that evening. However, a neighbor told police that appellant's son

had been in her care for approximately one and a half hours.

"Because of the descriptions from the various witnesses of appellant and the truck, the police placed appellant under arrest. A further check disclosed that the license plate number on the truck seen in the alley was the same as the license plate number of appellant's truck.

"Following appellant's arrest, a search at the jail produced two medallions, a pocketknife, and marijuana. Appellant's wife permitted police to search their residence. She told police officers that she owned a pair of pink rubber dishwashing gloves. However, when she attempted to show them to the police, she discovered they were missing.

"After receiving medical attention at the hospital, the victim returned to her home and discovered a fingertip from the rubber glove and a silver necklace in her home. A pair of pink rubber gloves found near the lumberyard, where appellant had stopped briefly after he ran into the alley, had a fingertip missing which matched the fingertip found in the victim's home.

"The silver necklace found in the victim's home was identified by appellant's wife as a necklace worn by appellant to which the medallions were attached which were found on appellant's person when he was searched at the jail. Appellant's wife further told the police officers that she and her husband had watched a movie, 'Don't Answer the Phone.' The wife expressed concern because the subject of the movie in many ways paralleled the attack on the victim in this case.

"Friends of appellant, Ken and Dana Lee Moses, had a conversation with appellant on the afternoon before the attack on the victim and he told them that he had watched the movie and wanted to do the things that were done in the movie. He stated that his wife "never gave him any," and that he was going to get some if he had to use force. He indicated the type of sexual activity he was seeking was fellatio. He also showed Ken and Dana a knife which he carried in his shoe.

"A few hours after the incident, four of the witnesses who had been alerted by the victim's screams, were taken to the jail where each was permitted to view appellant through a window in the cell and each identified him as the person they had seen coming out of the victim's apartment and running down the alley.

"While appellant was awaiting trial, he told a cellmate that he committed the crime. The cellmate, Douglas Barnett, testified that appellant told him in detail how the attack took place. The details matched the testimony of other witnesses in the case. On cross-examination, Barnett was asked if he had read in the newspapers any of the details he had recited. He replied that he had never read a newspaper article concerning the case and that everything he knew had been told to him by appellant while they were cellmates.

"When asked why he gave the police this information, he stated that at first he thought it might do him some good, but that in fact he received no benefit from any information he had furnished and that he had served out his sentence."

*Samaniego v. State,* 553 N.E.2d 120, 121–23 (Ind.1990), *reh'g denied.*

Samaniego's subsequent petition for post-conviction relief was denied. This appeal followed.

### STANDARD OF REVIEW

In post-conviction proceedings, the petitioner bears the burden of establishing the grounds for relief by a preponderance of the evidence. Ind.Post–Conviction Rule 1(5). Postconviction proceedings create a narrow remedy for subsequent collateral challenges to convictions and do not afford a " 'super appeal.' " *Weatherford v. State,* 619 N.E.2d 915, 916 (Ind.1993). Issues that were available on direct appeal may not be raised for the first time in a post-conviction petition. *Id.* at 917.

 When reviewing the judgment of the post-conviction court, this court considers only the evidence and reasonable inferences supporting the judgment. *Id.* at 917. We will neither judge witness credibility nor re-

weigh the evidence. *Howse v. State,* 672 N.E.2d 441, 442 (Ind.Ct.App.1996), *trans. denied* (1997). When the petitioner appeals from the denial of post-conviction relief, this court will not reverse the judgment unless the evidence is without conflict and leads only to a conclusion opposite that reached by the post-conviction court. *Id.*

## DISCUSSION AND DECISION

### I. Suppression of Evidence by the State

Samaniego asserts that the State failed to disclose evidence that was material to his defense. We disagree.

Federal and state due process guarantees require prosecutors to disclose to the defense evidence that is material either to guilt or punishment. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963); *Marshall v. State,* 621 N.E.2d 308, 315 (Ind.1993). Evidence is material if there is a reasonable likelihood that it might have affected the outcome of the trial. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Curry v. State,* 643 N.E.2d 963, 979 (Ind.Ct.App.1994), *trans. denied* (1995).

Here, the evidence that Samaniego alleged was material was the testimony of John Hullinger, a witness at the crime scene. At the post-conviction hearing, Hullinger testified that on the evening of the attack, he was walking near the victim's home with his friend when he heard someone scream. He saw the assailant exit through the victim's front door, jump over the porch railing, fall down, and then run away. The assailant crossed the road, stopped for a few minutes, and fled down an alley. Hullinger stated that he followed the assailant down the alley and saw the assailant get into a 1977–79 model Chevrolet truck and drive away.

Samaniego believes this testimony is material to his defense because it is eyewitness testimony that differs from the other eyewitness accounts of the assailant's escape. Specifically, Hullinger's account, if credible, provides a slightly shorter time period from the point when the assailant left the victim's home, to the time when he got into his truck and drove away.

On cross-examination, however, Hullinger stated that he and his friend were the only people on the street who witnessed the assailant's escape, and that no one else came until after the police arrived. This was in direct conflict with the testimony of several other eyewitnesses who either saw Samaniego flee from the victim's house, or who went outside and followed Samaniego to his truck. The victim's next door neighbor, Jackie Geimer, testified that she heard screams, went outside to investigate, and saw a man run out of the victim's house. Another neighbor, Brenda Grant, testified that she was standing with her two daughters on the sidewalk in front of the victim's house, when she saw Geimer come out of her house and asked her if there was trouble. Shortly thereafter, Grant saw the assailant, whom she later identified as Samaniego, exit the victim's home and run away. Grant's daughter, Kelly D'Andrea, corroborated Grant's account. Grant's husband, Rex, who was summoned by his daughter Kelly, testified that he immediately came out of his home and pursued Samaniego on his bicycle. Rex followed Samaniego into an alley and all the way to Samaniego's truck, where he saw another resident, Daniel Aguilar, accompanied by his daughter, Diana, question Samaniego. Hullinger's assertion that these witnesses were not present until after the police arrived severely undermined his credibility, and therefore, the materiality of his testimony.

On cross-examination, the prosecutor questioned Hullinger about the accuracy of his perceptions regarding the crime and this exchange occurred:

> "[Prosecutor]: Do you think you remember better today what happened back then or do you think you remember better when you talked to Officer Barger and told him what you saw?
>
> "[Hullinger]: Let's put it this way, once in awhile I had dreams of what happened. Would you know about that?
>
> "[Prosecutor]: No, I didn't realize that you had dreams about what happened. Did you tell the defense counsel that?
>
> "[Hullinger]: Yeah.

"[Prosecutor]: Are you testifying from your dreams that you have about what happened?

"[Hullinger]: No, this is what I knew what happened before cause I seen the guy jump off that porch. Who would be stupid enough that could jump off the porch just for the heck of it[?]

"[Prosecutor]: Do you see that in your dreams sometimes?

"[Hullinger]: Yeah, I seen what all what happened and after he gets in the truck."

*Record* at 513–14.[1] Based on this and other equivocal testimony, the post-conviction court determined that the credibility and probative value of Hullinger's testimony was negligible. Our review of the Record does not compel a conclusion opposite that reached by the post-conviction court.

■ We also find no merit to Samaniego's claim that the State withheld Hullinger's testimony. The officer who investigated the incident interviewed Hullinger and his friend Scott McClurg. The police report stated, in pertinent part:

"I talked with a John Hullinger (Age 15) next whom lives at 624 N. 2nd St. and a Scott McClurg (Age 14) whom lives at 1023 N. 2nd St.

"Both were southbound on Mercer Ave. Subject leaving house crossed approx. twenty feet in front of them. They described the subject as a male five eight to five ten in height, skinny and dark hair smoothed back as if he had a mask of some type on. Only other thing they could remember was sybject [*sic*] had on blue jeans."

*Record* at 516. The State made this report available to the defense. At the post-conviction hearing Hullinger testified that the officer's report was correct. On these facts, we fail to see how the State withheld Hullinger's testimony. The post-conviction court did not err.

## II. Newly Discovered Evidence

■ Samaniego also asserted that Hullinger's testimony was newly discovered evidence meriting a new trial. We disagree.

When asserting a claim based on newly discovered evidence, the petitioner must prove: (1) the evidence has been discovered since the trial; (2) it is material and relevant; (3) it is not cumulative; (4) it is not merely impeaching; (5) it is not privileged or incompetent; (6) due diligence was used to discover it in time for trial; (7) it is worthy of credit; (8) it can be produced upon a retrial of the case; and (9) it will probably produce a different result. *Fox v. State*, 568 N.E.2d 1006, 1007 (Ind.1991). Hullinger's testimony fails to meet this standard in several ways.

First, the evidence was known to Samaniego prior to trial. *See supra* Issue I. Second, it is not material and will not produce a different result upon retrial. *See id.; see also Curry*, 643 N.E.2d at 979 (defining material evidence as that which would have a reasonable probability of changing the outcome). Finally, it is not worthy of credit. *See supra* Issue I. Therefore, the post-conviction court did not err.

## III. Prosecutorial Misconduct

Samaniego claims the prosecutor engaged in misconduct by making improper remarks about Samaniego's race and religion. We agree that the prosecutor engaged in misconduct but find that it did not amount to fundamental error.

■ When reviewing a charge of prosecutorial misconduct, this court employs a two-step analysis: (1) we consider whether the prosecutor engaged in misconduct; and (2) we consider all the circumstances of the case to determine whether such misconduct placed the defendant in a position of grave peril to which he should not have been subjected. *Stowers v. State*, 657 N.E.2d 194, 198 (Ind.Ct.App.1995), *trans. denied* (1996). The latter is measured not by the degree of impropriety of the misconduct. *Id.* Instead, it is measured by the probable persuasive effect of the misconduct on the jury's decision and whether there were repeated examples

---

**1.** References to the "Record" signify the record prepared for Samaniego's direct appeal. Refer-

ences to "P.C. Record" will represent the record prepared for his post-conviction petition.

of misconduct that would evince a deliberate attempt to unfairly prejudice the defendant. *Lowery v. State,* 640 N.E.2d 1031, 1038 (Ind. 1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 525, 133 L.Ed.2d 432 (1995).

■ Because Samaniego did not object to the misconduct at trial and did not raise the issue on his direct appeal, the issue will be waived unless it amounts to fundamental error.[2] An error will be deemed fundamental if it was so prejudicial to the defendant that it was impossible for him to have a fair trial. *Lacey v. State,* 670 N.E.2d 1299, 1302 (Ind. Ct.App.1996). This court has held that prosecutorial misconduct may amount to fundamental error. *Stowers,* 657 N.E.2d at 198. *But see Hall v. State,* 646 N.E.2d 379, 381 (Ind.Ct.App.1995) (finding that post-conviction petitioner had waived issue of prosecutor misconduct when he failed to present it on direct appeal), *trans. denied.*

■ Here, the challenged conduct occurred on cross-examination and during closing argument. On cross-examination this exchange occurred between the prosecutor and Samaniego:

"[Prosecutor]: Let's get a little bit more specific about your prior convictions shall we. How about on the 8th day of January, 1980 in the Court of Common Pleas, Mercer County, Ohio, one Dean Samaniego, Albert Dean Samaniego, Horse Dean Albert Samaniego or Dean A. Samaniego or Dean Albert Samaniego was convicted of a felony Receiving Stolen Property in Cause Number 4554. Is that true? Was that you?

"[Samaniego]: It has to be me[.]

"[Prosecutor]: Well by the way what is your, what is your given name at birth?

"[Samaniego]: My given name at birth?

"[Prosecutor]: Uhmm (affirmative)[.] What does your birth certificate say?

"[Samaniego]: Dean A. Samaniego[.]

"[Prosecutor]: Well where did the name 'Horse' came [*sic*] from?

"[Samaniego]: I'm an Indian[.]

"[Prosecutor]: So you gave that name to yourself?

"[Samaniego]: No I'm listed on [the] Tribal role as Horse Dean A. Samaniego[.]

"[Prosecutor]: Where were you born?

"[Samaniego]: I was born in Celina, Ohio[.]

"[Prosecutor]: Are you listed in Celina, Ohio in the birth records of the Health Department there as 'Horse'?

"[Samaniego]: No sir I'm not[.]

"[Prosecutor]: So that is not your name is it?

"[Samaniego]: Please?

"[Prosecutor]: That is not your given name is it?

"[Samaniego]: Yes it is[.]

"[Prosecutor]: On June 25, 1984 in the Common Pleas Court of Mercer County, Ohio, again Dean A. Samaniego a/k/a Albert Dean Samaniego a/k/a Horse Dean Albert Samaniego a/k/a Dean Samaniego was convicted of a felony being Forgery in Cause Number 84CRM6, that was you was it not?

"[Samaniego]: Yes."

*Record* at 1453–54. Samaniego argues that this line of questioning was an improper attack on his Native–American heritage. We disagree. The excerpt from the trial transcript reveals that the prosecutor was attempting to admit evidence of Samaniego's prior convictions in Ohio. Because of the fact that Samaniego apparently had several aliases, the prosecutor was making sure that there was no confusion over Samaniego's name on his prior convictions. Although the questioning went beyond what was necessary to establish his identity, it did not amount to prosecutorial misconduct.

■ The prosecutor's remarks during closing argument, however, present far more serious problems. During closing argument the prosecutor stated:

"Well you know Mr. Ludy [defense counsel] kind of reminds me of what Custer must of looked like at the Last Stand.

Each time you turn around he saw a new arrow coming · at him. Each time he dodged one there was another one and by the time he circled around he had so many arrows in him he looked like a porcupine. And after [closing argument] I think Mr. Ludy looks a little bit like a porcupine....

"You didn't hear Mr. Ludy tell you anything about this chain because he couldn't. Do you think this chain didn't go around Horse Samaniego's neck? You bet it did. Did you even hear Horse Samaniego give an explanation why that chain wasn't with these? No he wouldn't call the police thieves, he wouldn't say it was put up [sic] it just vanished. The great chain god in the sky just decided to reclaim its own. Just like the great rubber god in the sky sucked out of his house on the 22nd of June, 1987, his wifes [sic] rubber gloves. Just like the great black stocking god took away, poof, his wife's black anklet. And just like the great red truck god laid down upon Horse all kinds of misery as he drove around the community on June 22.

"... That was a great truck god that dropped all that misery on him. And gosh almighty the truck god of Horse just caused his truck to stop right there, right in the path, just feet from [the victim's] house. I don't know, the gods weren't with him that is for sure."

*Record* at 1512–14.

▮ The constitutional principles of equal protection and due process forbid a prosecutor from attempting to gain a conviction on the basis of racial prejudice. *Smith v. Farley,* 59 F.3d 659, 663 (7th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 935, 133 L.Ed.2d 861 (1996). In fact, the United States Supreme Court has declared that "[t]he Constitution prohibits racially-biased prosecutorial arguments," *McCleskey v. Kemp,* 481 U.S. 279, 309 n. 30, 107 S.Ct. 1756, 1776 n. 30, 95 L.Ed.2d 262, 289 n. 30 (1987), and that "[d]iscrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice." *Rose v. Mitchell,* 443 U.S. 545, 555, 99 S.Ct. 2993, 3000, 61 L.Ed.2d 739, 749 (1979). In Indiana, reviewing courts will closely scrutinize allegations concerning the wrongful in-

jection of race into criminal proceedings. *Tompkins v. State,* 669 N.E.2d 394, 396 (Ind. 1996); *see also Gentry v. State,* 625 N.E.2d 1268, 1276 (Ind.Ct.App.1993) ("The State must steadfastly remember that justice is blind and equally available to all, without regard to race, color, or creed."), *trans. denied* (1994).

The State refers to the comments involving General Custer as an "unfortunate choice of analogy[.]" *Appellee's Brief* at 12. The post-conviction court declared that remarks about "the gods" and General Custer could not "be construed as attacking Defendant's race or religion." *P.C. Record* at 220. While the State·fails to acknowledge the gravity of the prosecutor's comments, the post-conviction court has misconstrued them. The prosecutor's remarks were when viewed in the best light, insensitive, deplorable when viewed in the worst.

The duty of the prosecutor extends beyond collecting convictions like a hunter seeking prey. Our supreme court noted this many years ago stating:

"A prosecuting attorney certainly has a duty to present the state's strongest case. In doing so, however, he is not licensed to use unethical or inflammatory tactics in an attempt to convict an accused. He has the same duty as a court to see that justice is administered in conformity with the recognized principles of law."

*Wasy v. State,* 236 Ind. 215, 219, 138 N.E.2d 1, 3 (1956). Prior to *Wasy,* the United States Supreme Court set forth the standard for federal prosecutors, a standard that all prosecuting attorneys would do well to follow:

"[A prosecuting attorney] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard

blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

*Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 632, 79 L.Ed. 1314 (1935).

Here, the prosecutor's comments could fairly be classified as "foul." Under our standard of review for prosecutorial misconduct, however, our focus is not on the degree of impropriety, but on the probable persuasive effect of the comments on the jury's decision. *Lowery,* 640 N.E.2d at 1038. In light of the substantial evidence supporting Samaniego's conviction, we hold that the prosecutor's reprehensible comments were not likely to have unfairly prejudiced the jury.

As noted by the supreme court in Samaniego's direct appeal, *see supra* Facts and Procedural History, the evidence of Samaniego's guilt was overwhelming. Brenda Grant identified Samaniego as the man who ran out of the victim's house. Her husband, Rex, who also identified Samaniego, saw him run toward a lumber depot, stop and bend down, and run toward his truck, where Samaniego encountered other residents, Dan and Diana Aguilar. Dan Aguilar questioned Samaniego about his presence in the neighborhood. In response, Samaniego mumbled that his truck was broken down. He then opened the hood for a second, closed it, and started the truck without difficulty, and sped away.[3] Dan Aguilar wrote down the license plate of Samaniego's truck, and along with his daughter Diana, also identified Samaniego.[4]

Physical evidence at the scene also pointed toward Samaniego. The victim stated that her assailant wore pink latex gloves, and that she tore a piece of the glove during her struggle. At the point where Samaniego stopped and bent down, the police discovered a pair of pink latex gloves with a portion of a fingertip torn off. They matched those gloves to a piece of pink latex found in the victim's apartment. When the police subsequently searched Samaniego's home, his wife stated that she had a pair of pink dishwashing gloves. After searching for them, she discovered that they were missing. The police also recovered a silver chain in the victim's apartment, one which Samaniego's wife identified as belonging to her husband. Based on the overwhelming amount of evidence and the reasonable inferences to be drawn therefrom, there is little doubt on our part that Samaniego was properly charged and convicted.

The fact that we affirm Samaniego's conviction should not be interpreted as a stamp of approval on the prosecutor's closing argument. Arguments like the one set forth in this case should be condemned by any individual or tribunal that has sworn to uphold the law and the principles of equality upon which it is founded. On the evidence before us, however, we hold that the misconduct did not rise to the level of fundamental error.

## IV. Ineffective Assistance of Counsel

Samaniego finally asserts that he received ineffective assistance of trial and appellate counsel. We disagree.

To demonstrate such ineffectiveness, the claimant must prove that counsel's performance fell below a wide range of professionally competent representation and that such representation likely prejudiced the outcome of his trial. *Hernandez v. State,* 638 N.E.2d 460, 461 (Ind.Ct.App.1994), *trans. denied.* On direct appeal, Samaniego raised the issue of ineffective assistance of trial counsel. *See Samaniego,* 553 N.E.2d at 126. Our supreme court found that his counsel "vigorously defended [Samaniego] and was well-prepared to cross-examine the State's witnesses." *Id.* Because that issue has been decided by our supreme court, it is not sub-

---

**3.** Samaniego admitted being in the victim's neighborhood because his truck ran out of gas. The fact that he started his truck immediately without any addition of fuel makes that claim highly unlikely. He also claimed that he was with his young son. His neighbor refuted that by stating that Samaniego's son was in her care during the time of the attack.

**4.** Dan Aguilar later identified Samaniego's truck as the one being in the alley and which Samaniego used to drive away.

ject to post-conviction review. *Hollonquest v. State,* 432 N.E.2d 37, 40 (Ind.1982).

Even if we were to consider Samaniego's claim that trial counsel was ineffective for failure to conduct adequate investigation, we would still reach the same conclusion as did our supreme court on his direct appeal. The second prerequisite to proving ineffective assistance of counsel is that counsel's deficient performance affected the outcome of the proceedings. Because we determined that Hullinger's testimony was not material, counsel's failure to find it did not adversely affect the outcome of Samaniego's trial. *See supra* Issue I.

■ Samaniego also claims that trial counsel was ineffective for failing to object to the identification procedure used by the police. *Our supreme court considered that issue on direct appeal and determined that in light of all the circumstances the procedure used was not impermissibly suggestive. Samaniego,* 553 N.E.2d at 123. Samaniego cites *Pemberton v. State,* 560 N.E.2d 524 (Ind.1990) for the proposition that trial counsel's failure to object to an impermissibly suggestive identification procedure constituted ineffective assistance of counsel. *Pemberton* is distinguishable from the present case because in *Pemberton,* the majority based its decision in part on the fact that it was a close case outside of the tainted identification. 560 N.E.2d at 527. Here, even without the personal identifications, there is substantial physical evidence that supports Samaniego's conviction. In addition, although proper procedure is to make an objection at trial, here counsel's failure to do so did not prevent full review of that issue on direct appeal; thus, no prejudice has been shown.

Samaniego also claims that counsel was ineffective for failing to object to the prosecutor's conduct. While we have previously noted our extreme disapproval of the prosecutor's remarks, their probable impact on the jury was minimized due to the overwhelming evidence presented against Samaniego. *See supra* Issue II. Therefore, Samaniego did not receive ineffective assistance of trial counsel.

The standard for establishing ineffective assistance of appellate counsel is identical to that applied to trial counsel. *Robinson v.*

*State,* 634 N.E.2d 765, 766 (Ind.Ct.App.1994). Samaniego asserts that appellate counsel was ineffective for failing to raise the issue of trial counsel's failure to object to the identification procedure and for failing to raise the issue of prosecutorial misconduct. We reject the former claim because the supreme court addressed that issue on direct appeal. *Samaniego,* 553 N.E.2d at 123. The latter claim should have been raised on direct appeal. We have, however, addressed that issue at length and found that such failure to raise the issue would not have produced a different outcome. Therefore, Samaniego did not receive ineffective assistance of appellate counsel.

Affirmed.

HOFFMAN, J., concurs.

SULLIVAN, J., concurs in result.