## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 28 2016, 6:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Darren Bedwell
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Michael Pugh,
*Appellant-Defendant*,

v.

State of Indiana,
*Appellee-Plaintiff*.

September 28, 2016

Court of Appeals Case No.
49A05-1509-CR-1508

Appeal from the Marion Superior Court

The Honorable Mark D. Stoner, Judge

Trial Court Cause No.
49G06-1311-FA-75156

**Brown, Judge.**

[1] Michael Pugh was convicted of burglary as a class A felony, three counts of robbery as class B felonies, six counts of criminal confinement as class B felonies, attempted robbery as a class B felony, thirteen counts of forgery as class C felonies, conspiracy to commit forgery as a class C felony, two counts of battery as class C felonies, and two counts of carjacking as class B felonies. Pugh raises several issues which we revise and restate as:

I.    Whether certain convictions for robbery, attempted robbery, and carjacking violate double jeopardy principles; and

II.   Whether certain convictions for criminal confinement and forgery violate the continuous crime doctrine.

We affirm in part and reverse in part.

## Facts and Procedural History

[2] At approximately 5:00 a.m. on October 24, 2013, Adrian Anthony, Trae Spells, Taiwan Lundy, and Pugh broke into a home in Indianapolis belonging to R.N. and B.N. One of the men entered the bedroom and held R.N. and B.N. at gunpoint, and the other men grabbed their cell phones and ransacked the house, taking anything of value including jewelry, purses, a vase containing coins, cologne, watches, electronics, DVD players, an iPod, and televisions.

[3] The men demanded money, and R.N. indicated their money was in the bank. One of the men fired a gun within a foot of R.N.'s head, shooting the wall. R.N. identified his debit card and wrote down his pin code so the men could use the ATM, and one of the men drove B.N.'s Jeep to an ATM. The men at the house stated that, if the man who went to the ATM was unable to obtain

money, they were going to kill R.N. and B.N.  R.N. and B.N. were held at gunpoint in the bedroom.  The man who went to the ATM returned and stated "[t]hey lied.  It didn't work.  The pin code didn't work" and "[l]et's shoot them."  Transcript at 69, 219.

[4]     The men took R.N. and B.N. from the bedroom to a living room, ordered them to their knees, and placed a pillow over their heads.  R.N. and B.N. believed they were going to be shot at that point.  The men kicked R.N. in the head, and R.N. pleaded with the men until they agreed to take him to the ATM.  R.N. drove Anthony, who held R.N. at gunpoint, to the ATM.  R.N. attempted to withdraw money, but was unsuccessful because access to his account had been locked due to the number of unsuccessful prior attempted transactions, and Anthony stated "[y]ou lied to me again.  You guys are dead.  You are dead absolutely." *Id.* at 79.  R.N. told Anthony that B.N. had a separate account with a separate debit card, Anthony agreed to retrieve B.N.'s debit card, and R.N. drove back to the house.  While Anthony and R.N. were traveling to and from the ATM, the other men removed televisions from the walls.  One of the men forced B.N. to lay on the floor with a blanket over her head, rubbed her back, butt, and breasts, and stated that "if he had a condom he would rape [her] but he didn't want his DNA inside" her. *Id.* at 229.

[5]     After R.N. and Anthony returned to the house, B.N. searched for and found her debit card, which was in her wallet, and then Anthony forced her at gunpoint to drive him to the ATM.  At the ATM, B.N. attempted to withdraw $800 but it did not work, and then she successfully withdrew $500.  She then

unsuccessfully attempted to make additional withdrawals. Anthony told her to tell the other men that she was able to withdraw only $400. B.N.'s last attempt to withdraw money occurred at 8:03:49 a.m.

[6] Meanwhile, as Anthony and B.N. were traveling to and from the ATM, Spells asked R.N. for a passcode to a computer, which R.N. did not provide. R.N. was tied up with an orange extension cord, and Spells and Lundy struck R.N. with an iron urn, shattered a glass vase on his head, hit him in the head with a pizza stone, and punched him in the face. The men placed duct tape over R.N.'s eye, mouth, and nose, R.N. said that he could not breathe, and one of the men replied "I don't care." *Id.* at 90. One of the men told R.N. "[y]ou've never received a beating like this, white boy." *Id.* at 91-92.

[7] Anthony and B.N. arrived back at the house, and the men bound B.N. with a rope or cord and duct tape. One of the men wrapped a cord around B.N.'s neck and "touched [her] vagina really forcefully." *Id.* at 247. R.N. heard the men stating that "they had to kill us, we knew too much, they had gone too far so they had no choice, they were going to kill us." *Id.* at 97-98. The men struck R.N. and B.N. on their heads severely and repeatedly with a DVD player, and the blows were so forceful that B.N. at first thought she had been shot. The men loaded items into R.N. and B.N.'s Jeep and Subaru. Spells initially attempted to drive the Subaru but did not know how to drive a manual transmission, and he left the vehicle against a light post in the front yard of the house. After the men left, R.N. and B.N. removed their restraints, ran to a neighbor's house, and called 911. The police discovered the Jeep and recovered

some of the stolen items. The men sold phones and jewelry taken from R.N. and B.N. to a store, the store made a copy of Pugh's photo identification, and the police later recovered the property.

[8] The State, in an amended charging information, alleged Pugh, Anthony, Spells, and Lundy committed burglary as a class A felony, conspiracy to commit burglary as a class A felony, three counts of robbery as class B felonies, eleven counts of criminal confinement as class B felonies, two counts of intimidation as class C felonies, attempted robbery as a class B felony, thirteen counts of forgery as class C felonies, conspiracy to commit forgery as a class C felony, sexual battery as a class C felony, criminal deviate conduct as a class A felony, three counts of battery as class C felonies, and two counts of carjacking as class B felonies. Anthony, Pugh, and Lundy were tried together, and Spells testified that he entered a plea agreement, that his understanding was that he could be sentenced to fifty to eighty years, and that he agreed to testify in this case. The jury was given an instruction on accomplice liability. The jury found Pugh guilty on thirty counts and not guilty on one count of battery as a class C felony, the State dismissed nine counts, and the court merged the conviction for conspiracy to commit burglary with the conviction for burglary.

[9] Ultimately, judgments of conviction were entered on the following: burglary as a class A felony under Count 1; robbery as class B felonies under Counts 3, 4, and 28; criminal confinement as class B felonies under Count 10, 22, 23, 26, 27, and 37; attempted robbery as a class B felony Count 11; forgery as class C felonies under Counts 12 through 21 and 29 through 31; conspiracy to commit

forgery as a class C felony under Count 32; battery as class C felonies under Counts 33 and 38; and carjacking as class B felonies under Counts 39 and 40. The court sentenced Pugh to forty years on Count 1; fifteen years on Counts 3, 4, 10, 11, 22, 23, 26, 27, 28, 37, 39, and 40; and six years on Counts 12 through 21, 29 through 33, and 38. The court ordered that Counts 1, 3, 12, 33, 38, and 39 be served consecutively and that all other counts be served concurrently, for an aggregate sentence of eighty-eight years.

## *Discussion*

### I.

[10] The first issue is whether Pugh's convictions for robbery, attempted robbery, and carjacking violate double jeopardy principles. The Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." IND. CONST. art. 1, § 14. "Indiana's Double Jeopardy Clause . . . prevent[s] the State from being able to proceed against a person twice for the same criminal transgression." *Hopkins v. State*, 759 N.E.2d 633, 639 (Ind. 2001) (quoting *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999)). The Indiana Supreme Court has held that "two or more offenses are the 'same offense' in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Richardson*, 717 N.E.2d at 49.

[11]  Pugh asserts that his convictions for robbery under Count 3 and attempted robbery under Count 11 are based in part on the same debit card and notes that the information for both counts alleged the defendants were armed with a deadly weapon. He also asserts that his carjacking convictions under Counts 39 and 40 are based on the same actual facts as his robbery convictions under Counts 3 and 4, and argues that each carjacking count is included in Counts 3 or 4 because each car is an item of property. The State responds that the convictions which Pugh challenges were proven by separate evidentiary facts and, with respect to the carjacking convictions, that the statutory elements test is inapplicable because the charges were based on separate acts and separate property.

[12]  In applying the actual evidence test, a defendant must demonstrate and a reviewing court must conclude that there is a reasonable possibility that the evidentiary facts used by the factfinder to establish the essential elements of an offense for which the defendant was convicted or acquitted may also have been used to establish all the essential elements of a second challenged offense. *Hines v. State*, 30 N.E.3d 1216, 1222 (Ind. 2015). The existence of a reasonable possibility turns on a practical assessment of whether the fact finder may have latched on to exactly the same facts for both convictions. *Garrett v. State*, 992 N.E.2d 710, 720 (Ind. 2013). We evaluate the evidence from the jury's perspective and may consider the charging information, jury instructions, and arguments of counsel. *Id.*

A. *Robbery and Attempted Robbery*

[13]     We first address Pugh's argument that either his conviction on Count 3 or his conviction on Count 11 must be vacated. The State's charging information for Count 3 alleged that Pugh, Anthony, Spells, and Lundy "did knowingly, while armed with a deadly weapon, that is: a handgun, take from the person or presence of [R.N.] property, that is: electronics and/or credit/debit cards and/or jewelry, and other items, by putting [R.N.] in fear or by using or threatening the use of force on [R.N.]." Appellant's Appendix at 154. The information for Count 11 alleged that Pugh, Anthony, Spells, and Lundy "did attempt to commit the crime of Robbery, that is: to knowingly, while armed with a deadly weapon, that is: a handgun, take from the person or presence of [R.N.] property, that is: United States currency," by "putting [R.N.] in fear or by using or threatening the use of force on R.N., and the following substantial step was committed in furtherance of the crime, that is: demanding [R.N.]'s PIN number to insert into the ATM[.]" *Id.* at 157. The jury was instructed as to these allegations.

[14]     The State elicited testimony from R.N. that the men took jewelry, cologne, watches, shoes, purses, electronics, DVD players, cell phones, and televisions, and it presented evidence of some of the property police recovered. R.N. also testified that the men asked "[w]here's the cash," that he replied "[i]t's all in the bank," and they replied "[w]ell, we're going to go to the ATM. Write down your pin code." Transcript at 64. R.N. "told them which one was [his] debit card and that way they could go to the ATM and withdraw money" and he "wrote it down on the back of a business card, [his] pin code." *Id.* at 64-65.

R.N. testified that he and B.N. "[g]ave them directions on which way to go to get to that bank to withdraw that money" and he gave the information to "the lead guy with the gun on us the whole time." *Id.* at 65. R.N. testified that "[t]he threats were made that if they went and we were playing any games, I didn't write down the pin code, if they couldn't get money that we would die." *Id.* at 68. One of the men then took R.N.'s debit card to the ATM and attempted, unsuccessfully, to withdraw cash.

[15] The record reveals that Counts 3 and 11 were not supported by the same evidentiary facts. Although Count 3 alleged that Pugh and the other men took debit cards, it also alleged they took other property including electronics and jewelry, and extensive evidence was before the jury regarding the property taken by the men in addition to R.N.'s debit card and that the men also demanded R.N.'s pin in order to use the debit card. Based upon the record, we conclude there is no reasonable possibility that the evidentiary facts used to establish the essential elements of Pugh's conviction for attempted robbery under Count 11 were used to establish all the essential elements of his conviction for robbery under Count 3.

[16] Further, to the extent Counts 3 and 11 both alleged that Pugh committed the crimes while armed with a deadly weapon, we note that the fact the offenses were committed while armed with a gun or the same gun does not require the reversal of either conviction or a reduction of the level of felony of either conviction on double jeopardy grounds. *See Sistrunk v. State*, 36 N.E.3d 1051, 1054 (Ind. 2015) (concluding "that committing two or more separate offenses

each while armed with a deadly weapon—even the same weapon—is not within the category of rules precluding the enhancement of each offense") (citing *Gates v. State*, 759 N.E.2d 631, 633 n.2 (Ind. 2001) ("It is well established in Indiana that the use of a single deadly weapon during the commission of separate offenses may enhance the level of each offense.")). We find no double jeopardy violation with respect to Pugh's convictions on Counts 3 and 11.

B. *Carjacking and Robbery*

[17] We next address Pugh's argument that his convictions on Counts 39 and 40 should be vacated. To the extent Pugh argues the statutory elements test is applicable and "[e]ach Carjacking count (Counts 39 and 40[]) is included in Count 3 or Count 4 because each car is an item of property," Appellant's Brief at 21, we observe that the State's charging information for Count 3 alleged that Pugh and the other defendants did knowingly take, from the person or presence of R.N., property, "that is: electronics and/or credit/debit cards and/or jewelry, and other items . . . ." Appellant's Appendix at 154. Count 4 contained similar allegations except that B.N. was the alleged victim. Count 39 alleged that the men did knowingly take, from the person or presence of R.N. and/or B.N., "a motor vehicle, that is: a 2006 Jeep Commander," and Count 40 alleged the men did knowingly take, from the person or presence of R.N. and/or B.N., "a motor vehicle, that is: a 2010 Subaru Impreza . . . ." *Id.* at 165-166. The carjacking offenses as charged in this case are not lesser-included offenses of the robbery offenses because the robbery offenses were based on the taking of property other than the vehicles, and the convictions do not violate the

statutory elements test. *See Goudy v. State*, 689 N.E.2d 686, 698 (Ind. 1997) (emphasizing that, while the conviction for carjacking was a lesser-included offense of robbery as charged in that case, "Carjacking would not necessarily always be an included offense within Robbery" and that, "[i]f a person was convicted of Carjacking for the taking of a motor vehicle and of Robbery for the taking of some *other* property, then ordinarily no 'included offense' problems would arise"), *reh'g denied*.

[18] To the extent Pugh argues his convictions on Counts 39 and 40 must be vacated because they are based on the same actual facts as Counts 3 and 4, the record reveals that the State presented evidence that the men took electronics, jewelry, and other items. Additionally, the State presented evidence which established that the men took a 2006 Jeep Commander and a 2010 Subaru Impreza. The jury was instructed regarding the four counts. The record reveals that Pugh's convictions on Counts 3, 4, 39, and 40 were not supported by the same evidentiary facts. Extensive evidence was before the jury regarding the property taken by the defendants in addition to the vehicles. Based upon the record, we conclude there is no reasonable possibility that the evidentiary facts used to establish the essential elements of Pugh's convictions for carjacking under Counts 39 and 40 were used to establish all the essential elements of his convictions for robbery under Counts 3 and 4. We find no double jeopardy violation with respect to Counts 39 and 40.

## II.

[19] The next issue is whether Pugh's convictions for criminal confinement and forgery violate the continuous crime doctrine. The continuous crime doctrine defines those instances where a defendant's conduct amounts only to a single chargeable crime and prevents the State from charging a defendant twice for the same continuous offense. *Koch v. State*, 952 N.E.2d 359, 373 (Ind. Ct. App. 2011), *trans. denied*. The doctrine "essentially provides that actions that are sufficient in themselves to constitute separate criminal offenses may be so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction." *Id.* (citation omitted). The doctrine applies in those situations where a defendant is charged multiple times with one offense. *Id*. The continuous crime doctrine does not seek to reconcile the double jeopardy implications of two distinct chargeable crimes; rather, it defines those instances where a defendant's conduct amounts only to a single chargeable crime. *Hines*, 30 N.E.3d at 1219 (citing *Pierce v. State,* 761 N.E.2d 826, 830 (Ind. 2002) (recognizing "a series of rules of statutory construction and common law that are often described as double jeopardy, but are not governed by the constitutional test set forth in *Richardson*")). The continuous crime doctrine requires a fact-sensitive analysis. *Chavez v. State*, 988 N.E.2d 1226, 1229 (Ind. Ct. App. 2013), *trans. denied*.

A. *Criminal Confinement*

[20] Pugh asserts that four of his five criminal confinement convictions related to the confinement of B.N. must be vacated pursuant to the continuous crime doctrine, that B.N. was continuously confined from the time the men entered

the bedroom until they left the house around 8:00 a.m., and that during that time B.N. was not objectively or subjectively free to leave. The State concedes that Pugh's multiple convictions for criminal confinement may violate the continuous crime doctrine. It maintains, however, that "the circumstances of the confinement and intended crimes changed when B.N. was taken to an entirely different location to access an ATM," that Count 27 was different in that B.N. was removed from the residence and the confinement was aimed at the different intended crime of forgery, and that Count 37 related to her restraint after being returned to the residence so that one of the men could commit further sexual touchings and Pugh could batter her with the DVD player. Appellee's Brief at 22.

[21] Pugh was convicted of criminal confinement under Counts 10, 22, 23, 26, 27, and 37. Count 10 related to the confinement of R.N., and the other counts related to the confinement of B.N. In particular, Count 10 alleged that the men "did knowingly, by force, or threat of force, remove [R.N.] from one place to another, that is: from the residence . . . to a Chase Bank branch." Appellant's Appendix at 156. With respect to the confinement of B.N., Count 22 alleged the men "did knowingly . . . remove [B.N.] from one place to another, that is: from the bedroom of the residence to the living area," Count 23 alleged they "did knowingly . . . confine [B.N.] by ordering [her] to get down on to the floor," Count 26 alleged they "did knowingly . . . remove [B.N.] from one place to another, that is: ordering her from the living area to search the residence for her purse," Count 27 alleged they "did knowingly . . . remove [B.N.] from one

place to another, that is: from the residence . . . to a Chase Bank branch," and Count 37 alleged they "did knowingly . . . confine [B.N.] by binding [her] hands and feet with duct tape and/or tying [her] neck, hands and feet with a rope." *Id.* at 160-162, 165.

[22] At the time of the home invasion, Ind. Code § 35-42-3-3 (2013) provided that "[a] person who knowingly or intentionally: (1) confines another person without the other person's consent; or (2) removes another person, by fraud, enticement, force, or threat of force, from one (1) place to another; commits criminal confinement" and that the offense is "a Class B felony if it: (A) is committed while armed with a deadly weapon" or "(B) results in serious bodily injury to a person other than the confining or removing person." (Subsequently amended by Pub. L. No. 158-2013, § 434 (eff. Jul. 1, 2014)).

[23] In *Hines*, the Indiana Supreme Court stated the legislature defines "when a criminal offense is 'continuous,' e.g. not terminated by a single act or fact but subsisting for a definite period and covering successive, similar occurrences" and that it had applied the continuous crime doctrine in the context of confinement. 30 N.E.3d at 1219-1220, 1220 n.2 (citing *Bartlett v. State*, 711 N.E.2d 497, 500-501 (Ind. 1999) (noting that the unlawful detention began when defendant pointed a gun at the victim and ended only when the victim escaped, that at no point before the victim's escape was he free to go, and that between these two points the victim was either tied up, under the control of the gun, or acting under the threat or fear of force); *Haggard v. State*, 445 N.E.2d 969, 972 (Ind. 1983) (noting the defendant committed one continuous act which

violated the state statute against confinement and there was no evidence of any interruption of this confinement at any point from the time of a robbery until the act of rape was concluded), *modified on other grounds*).

[24] In *Penrod v. State*, the Court stated that "[a] confinement ends when the victim both feels free and is, in fact, free from detention, and a separate confinement begins if and when detention of the victim is re-established." 810 N.E.2d 345, 346 (Ind. 2004) (citing *Boyd v. State*, 766 N.E.2d 396, 400 (Ind. Ct. App. 2002)). "Where that has not occurred, multiple convictions are inappropriate even when there are variations in the way the counts are charged." *Id.* (citing *Curry v. State*, 643 N.E.2d 963, 980-981 (Ind. Ct. App. 1994), *reh'g denied*, *trans. denied*).

[25] The record reveals that B.N.'s confinement began when the defendants entered the bedroom and that, from that moment until the men left the house over three hours later, B.N. did not feel free, and in fact was not free, from detention. Throughout the entire period, B.N. was either bound, restrained by the use of a gun, or acting under the threat or fear of force. B.N. was not free to leave immediately after she was removed from the bedroom of the residence to the living area, after she was ordered to the floor, after she was ordered to search for her purse, or after she was removed from the residence to travel to the ATM. The fact that there are variations in the way the counts related to B.N.'s confinement were charged does not support multiple convictions. In short, B.N. was continuously confined from the time the men entered the house

around 5:00 a.m. until they left the house after 8:00 a.m., and there is no evidence of any interruption of B.N's confinement during this period.

[26] Based upon the record, we conclude that the acts alleged in Counts 10, 22, 23, 26, 27, and 37 related to the confinement of R.N. were sufficiently compressed in terms of singleness of purpose and continuity of action so as to constitute a single transaction for purposes of the continuous crime doctrine. *See Penrod*, 810 N.E.2d at 346 (observing that the charging instrument alleged that kidnapping occurred when the defendant confined the victim in the course of hijacking her vehicle, that one of the confinement counts alleged that the defendant confined the victim by transporting her to the scene where he assaulted her, and that the other confinement count alleged that he confined her by placing her in the trunk of a vehicle, and concluding that the events constituted one continuous confinement and that "[t]he confinements as charged here occurred during the greater course of the kidnapping and thus were not appropriate as separate crimes"); *Curry*, 643 N.E.2d at 980-981 (observing the evidence established only one continuous confinement, that the victim was confined and removed from one place to another but was never free from detention during the twenty-six-hour confinement and that, even during the defendant's absences, she did not feel free to attempt an escape). Accordingly, we remand with instructions to vacate Pugh's convictions for criminal confinement under Counts 23, 26, 27, and 37.

B. *Forgery*

[27]     Pugh further asserts that there were three trips to the ATM to steal money, that Counts 12 through 16 are based on the first trip when one of the men took R.N.'s card to the bank and unsuccessfully attempted to withdraw money, that Counts 17 through 21 are based on the second trip to the bank with R.N. during which R.N. unsuccessfully attempted to make withdrawals, that Counts 29 through 31 are based on the third trip to the bank with B.N. during which she withdrew money using her debit card, and that all but three forgery convictions should be vacated under the continuous crime doctrine. The State responds that "each finite act of utterance by entering one of the victims' ATM cards into the ATM and entering a pin code was alleged to be a distinct act of forgery" and that "[t]hese distinct criminal acts included thirteen attempted ATM transactions and one successful ATM transaction from R.N. and B.N.'s accounts." Appellee's Brief at 25-26.

[28]     In *Wiseman v. State*, the defendant was convicted of seven separate counts of forgery. 521 N.E.2d 942, 945 (Ind. 1988), *reh'g denied*. The Indiana Supreme Court observed that each information for forgery charged that the defendant, unlawfully and with intent to defraud, uttered to a bank a forged check and that the seven stolen checks were presented to a bank at the same time, on the same date, to the same person, and were all listed on one deposit slip. *Id.* at 946. The Court held that the conduct of the defendant supported a single count of forgery and that he had been erroneously subjected to forgery convictions on multiple counts. *Id.*

[29] In *Blythe v. State*, this court observed that the defendant was convicted of nine counts of forgery, with each count related to a different falsified signature, but all sharing the common intent to defraud, namely, to obtain the approval of the ballot petitions for a presidential candidate. 14 N.E.3d 823, 831 (Ind. Ct. App. 2014). We noted that the charging information alleged that the offenses occurred on or about January and February 2008, that the falsified signatures were placed on the ballot petitions during a relatively short period of time in St. Joseph County, and that the placement of the falsified signatures was performed for a single purpose, and we concluded that the defendant's actions constituted a single act of forgery. *Id.*

[30] Based upon the evidence, we conclude that Pugh's actions constituted three acts of forgery rather than thirteen. The first act of forgery occurred when one of the men took R.N.'s debit card to an ATM and unsuccessfully attempted to withdraw cash. State's Exhibit 216 shows that there were five attempted transactions, all of which were declined, over a period of one minute and seven seconds, and the declined transactions occurred at 6:17:43 a.m., 6:18:06 a.m., 6:18:15 a.m., 6:18:39 a.m., and 6:18:50 a.m. These actions, alleged in Counts 12 through 16, were sufficiently compressed in terms of time, place, singleness of purpose, and continuity of action so as to constitute a single transaction for purposes of the continuous crime doctrine.

[31] The second act of forgery occurred when Anthony took R.N. to the ATM and R.N. unsuccessfully attempted to withdraw cash. State's Exhibit 216 shows that there were five attempted transactions, all of which were declined, over a

period of fifty-six seconds, and the declined transactions occurred at 7:36:32 a.m., 7:36:40 a.m., 7:36:59 a.m., 7:37:17 a.m., and 7:37:28 a.m. These actions, alleged in Counts 17 through 21, were sufficiently compressed in terms of time, place, singleness of purpose, and continuity of action so as to constitute a single transaction.

[32] The final act of forgery occurred when one of the men took B.N. to the ATM to withdraw cash. During this trip, B.N. successfully withdrew $500 in one transaction at 8:01:32 a.m., attempted to make a withdrawal of $200 at 8:02:47 a.m., which was declined, and then attempted to make a withdrawal of $80 at 8:03:49 a.m., which was also declined, and the transactions occurred over a period of two minutes and seventeen seconds. These actions, alleged in Counts 29 through 31, were sufficiently compressed in terms of singleness of purpose and continuity of action so as to constitute a single transaction for purposes of the continuous crime doctrine.

[33] Therefore, we remand with instructions to vacate Pugh's convictions for forgery under Counts 13 through 16, Counts 18 through 21, and Counts 30 and 31. *See Wiseman*, 521 N.E.2d at 946 (holding that the conduct of the defendant supported a single count of forgery and the defendant was erroneously subjected to multiple forgery convictions and remanding for resentencing to reflect conviction of just one count of forgery); *Blythe*, 14 N.E.3d at 831 (concluding the defendant's actions constituted a single act of forgery and remanding with instructions to vacate eight of the defendant's nine forgery convictions); *see also Chavez*, 988 N.E.2d at 1229 (holding that the defendant

committed two crimes of child molesting rather than five and noting that three of the acts occurred during a first encounter between the defendant and the victim and two of the acts occurred during a second encounter); *Duvall v. State*, 978 N.E.2d 417, 428 (Ind. Ct. App. 2012) (noting in part that the defendant's convictions for insurance fraud stemmed from six false statements given in a single insurance investigation interview and holding that the defendant's conduct was continuous so as to constitute one offense of insurance fraud), *trans. denied*.

## *Conclusion*

[34] For the foregoing reasons, we remand with instructions to vacate Pugh's convictions for criminal confinement under Counts 23, 26, 27, and 37 and his convictions for forgery under Counts 13 through 16, Counts 18 through 21, and Counts 30 and 31.[1] We affirm Pugh's other convictions.

[35] Affirmed in part and reversed in part.

Baker, J., and May, J., concur.

---

[1] Pugh's aggregate sentence will not be affected as the trial court ordered that the sentences for the convictions which we order vacated be served concurrently with other sentences we do not disturb.